1

2

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEBRASKA

3    IN RE:                        )  BK 24-40267-BSK
                                   )     (Chapter 7)
     ALDEN H. ZUHLKE and           )
4    LISA A. ZUHLKE,               )
                                   )
5           Debtors.              )

6

## DEPOSITION OF DOUGLAS HALL

7

8         Taken at the Madison County Courthouse,
          located at 1313 N Main, Madison,
9         Nebraska;
          On the 16th day of April, 2025
10        commencing at 9:43 a.m.;
          Taken on behalf of Rabo Agrifinance,
11        herein by its attorney Richard P. Garden,
          Jr.;
12        Before Tracy S. Kaczor, CSR.

13

## APPEARANCES

14

15   On behalf of          RICHARD P. GARDEN
     Rabo Agrifinance:     Attorney at Law
16                         233 S 13th Street
                           1900 US Bank Building
17                         Lincoln, NE 68508

18

19   On behalf of          LAUREN GOODMAN
     Dillan Zuhlke         Attorney at Law
20   Derek Zuhlke          1601 Dodge Street
                           Suite 3700
21                         Omaha, NE 68102

22   Chapter 7 Trustee:    PHILIP M. KELLY
                           Attorney at Law
23                         PO Box 419
                           Scottsbluff, NE 69363

24

25   Also present:         Dillan Zuhlke
                           Derek Zuhlke

_____

## **INDEX**

**WITNESS: Douglas Hall**                          **Page**

Examination by Mr. Garden                    4, 195

Examination by Ms. Goodman              114, 195

Examination by Mr. Kelly                          183


**EXHIBITS:**                                        **Marked**

1 - 26                                                          4
27 - 28                                                      114
29                                                             183

## <u>STIPULATIONS</u>

It is stipulated and agreed by and between the parties hereto:

1.  That the deposition may be taken before myself, Tracy S. Kaczor, CSR and General Notary Public.

2.  That the notice of the time and place of the taking of this deposition is waived.

3.  That the notice of the filing of the deposition is waived.

4.  That the deposition is being taken pursuant to the Nebraska Rules of Discovery.

5.  That the testimony may be transcribed outside the presence of the witness.

```
 1              (Exhibits No. 1 through 26 were
 2              marked.)
 3              MR. GARDEN:  As a housecleaning
 4    matter, we've stipulated to reserve all
 5    objections except as to form and foundation.
 6              COURT REPORTER:  Yes, correct.
 7              MR. GARDEN:  All right.
 8                  DOUGLAS HALL,
 9               Having been first duly sworn,
10               testified as follows:
11              EXAMINATION BY MR. GARDEN
12         Q.  Sir, would you state your name,
13    please, and spell it for the record.
14         A.  Douglas Alan Hall.
15         Q.  And where do you live?
16         A.  85882 526th Avenue, Neligh,
17    Nebraska.
18         Q.  You're appearing here pursuant to a
19    subpoena that we marked as Exhibit 1, aren't
20    you?
21         A.  I am.
22         Q.  Have you ever given a deposition
23    before?
24         A.  Yes.
25         Q.  How long ago?
```

1      A.  Quite a few years.  I don't know how
2  long.
3      Q.  I'm kind of curious, what kind of
4  case?
5      A.  Actually, a couple different ones,
6  but one of them was with a land deal that a
7  representative of AJ DeCoster said he was
8  going to sell me some land and then they
9  backed out.
10      Q.  All right.  So a contract case?
11      A.  (Witness nodding head yes.)
12      Q.  We've got some pretty easy ground
13  rules here today.  If you don't hear me or
14  don't understand me, let me know.  And that's
15  going to bring up the second rule, that we
16  have to answer affirmatively.  And kind of the
17  third more of a guideline, but for the court
18  reporter, let's not talk over each other, so
19  when I'm done then you can answer.
20      A.  (Witness nodding head yes.)
21      Q.  If you don't know the answer, feel
22  free to say so, okay?
23      A.  Yes.
24      Q.  Can you tell me about your
25  educational background?

1       A.   Graduate from Plainview High School.

2       Q.   And what have you done for a living?

3       A.   Farmed.

4       Q.   Okay.  And are you familiar with

5   Sunshine Ranch Co.?

6       A.   Yes.

7       Q.   How are you familiar with the

8   company?

9       A.   Familiar with the company, my

10  grandpa, my grandma, and my dad, the bookwork

11  said 1965, December, and that's part of what

12  they put all of their assets together at the

13  time and formed that.

14      Q.   And so your grandparents put their

15  assets into the company, I'll just call it

16  Sunshine?

17      A.   Yes, and my dad.

18      Q.   So, I'm handing you what we marked

19  as Exhibit 2, do you recognize that?

20      A.   Yes.

21      Q.   What is it?

22      A.   It says Articles of Incorporation.

23      Q.   For Sunshine?

24      A.   For Sunshine Ranch Company.

25      Q.   And is the corporation still in good

1    standing to your knowledge?

2         A.   As far as I know.

3         Q.   Are you an officer or director of

4    Sunshine?

5         A.   President, officer.

6         Q.   Are you also a director?

7         A.   Not that I know of.

8         Q.   Okay.  How long have you been an

9    officer of Sunshine?

10        A.   I don't know, probably sometime in

11   the '90s.

12        Q.   When did you acquire your stock in

13   Sunshine?

14        A.   1966.

15        Q.   How did you acquire it?

16        A.   In that -- I always understood it

17   was 1966.  I had not studied the corporate

18   book until just before I gave it to Phil.  It

19   looked like the stock was in several different

20   increments along the way.  I always understood

21   it was 1966, but looking at it, it looked like

22   some of it was 1970, some of it was different

23   dates it was given to me.

24        Q.   Are there other current officers of

25   Sunshine?

1          A.  Officers?

2          Q.  Yeah, like a vice president,

3   secretary?

4          A.  My dad is basically secretary,

5   treasurer, Sumner Alan Hall.

6          Q.  Any other officers?

7          A.  No.

8          Q.  Who runs the company?

9          A.  Doug, me.

10         Q.  All right.  Sir, I'm showing you

11  what we marked as Exhibit 3 and ask do you

12  recognize that document?

13         A.  It says Bylaws.

14         Q.  Are those the bylaws of Sunshine

15  Ranch?

16         A.  As far as I know.

17         Q.  The bylaws require an annual meeting

18  of shareholders.  When's the last time the

19  shareholders had an annual meeting?

20         A.  Probably a long time ago, several

21  years.

22         Q.  More than five?

23         A.  Probably.

24         Q.  The bylaws also require three

25  directors.  Do you know, are there directors

1   of the company?

2       A.  I'm probably a director, my dad is

3   probably a director, I don't know of anybody

4   else.

5       Q.  All right.

6       A.  Even though I said I wasn't a

7   director.  I don't study this thing, I haven't

8   looked at it.

9       Q.  All right.  Are you aware of any

10  restrictions on the pledge of stock in

11  Sunshine?

12      A.  No.

13      Q.  Does the corporation pay dividends?

14      A.  No.

15      Q.  Has it ever paid dividends, to your

16  knowledge?

17      A.  No.

18      Q.  Are you aware of any shareholder

19  agreements relating to the sale of stock by a

20  shareholder?

21      A.  No.

22      Q.  Are there any agreements amongst the

23  shareholders regarding a right of first

24  refusal?

25      A.  Not that I know of unless it's in

1    here (indicating).

2          Q.   All right.  Sir, I'm going to -- and

3    when you say 'here' you mean Exhibit 3, the

4    bylaws?

5          A.   That's correct.

6          Q.   Thank you.  I'm handing you what we

7    marked as Exhibit 4.  Do you recognize that

8    document?

9          A.   Stock register, yes.

10         Q.   For Sunshine?

11         A.   It says for Sunshine Ranch Company,

12   stock ownership.

13         Q.   All right.  And you said earlier --

14   or you testified that you had looked at some

15   papers earlier that suggested that you had

16   acquired your stock over a period of time.  Is

17   Exhibit 4 the document you were looking at?

18         A.   I was actually looking at the stock

19   certificates in the back of the book.

20         Q.   Okay.

21         A.   Or the record of stock certificates.

22         Q.   I think if you page through

23   Exhibit 4 you'll see the stock certificates

24   are attached.

25         A.   Yes.

1      Q.  So, do you know who the current

2   shareholders of Sunshine Ranch are?

3      A.  Yes.

4      Q.  Who are they?

5      A.  Sumner Alan Hall, Douglas Alan Hall,

6   Lisa Ann Zuhlke, Kevin Bruce Hall, Kimberly

7   JoAnne Clark.

8      Q.  All right.  Do you know when Lisa

9   Zuhlke acquired her shares in the company?

10      A.  She acquired shares, according to

11   this, December 30, 1965, was one deal for 600

12   shares.  I would have to go through them all.

13      Q.  But whatever Exhibit 4 would show

14   would be the dates that Lisa Zuhlke acquired

15   her shares?

16      A.  That's correct.

17      Q.  All right.  I take it that, I hate

18   to call them your ancestors, but your parents'

19   grandparents gifted stock to the four

20   children, which would be Kevin, Kimberly,

21   Lisa, and you?

22      A.  Yes.

23      Q.  And they gifted in equal shares?

24      A.  Yes.

25      Q.  So, how many shares do you own

1    today, do you know?

2         A.   11 percent plus a 5 percent I bought

3    of my grandma's estate.

4         Q.   Okay.  And that would have been

5    Barbara Hall?

6         A.   Barbara Louise Hall.

7         Q.   So, roughly, 16 percent?

8         A.   It might be 17 with the odd

9    fractions.

10        Q.   Okay.  Now Kevin, that is, is he

11   your brother?

12        A.   Correct.

13        Q.   Where does he live?

14        A.   He lives in rural Louisville,

15   Nebraska.

16        Q.   What's Kevin's involvement in the

17   corporation?

18        A.   Nothing.

19        Q.   And Kimberly, where does she live?

20        A.   South of Plainview ten miles.

21        Q.   What's her involvement in the

22   company?

23        A.   Nothing.

24        Q.   Lisa, what is her involvement in the

25   company?

1      A.  Nothing.

2      Q.  She doesn't sit on the board?

3      A.  No.

4      Q.  Does she sign any papers for the

5  company?

6      A.  Can I elaborate just a little bit?

7      Q.  Yes, sir.

8      A.  She doesn't sign any papers for the

9  company, but every year she's required by the

10  FSA, Farm Service Agency, to sign a form that

11  says that she didn't make any more than

12  999,000 dollars.

13      MR. KELLY:  I'm sorry, could you

14  repeat that, I couldn't hear.

15      A.  Every year she's required by the

16  Farm Service Agency, FSA, to sign a form that

17  says she doesn't make over 999,000 dollars,

18  along with everybody else that's named on the

19  corporate register, ledger, whatever, that FSA

20  has.

21      Q.  (Mr. Garden) Is that Antelope County

22  FSA office?

23      A.  Yes.

24      Q.  Thank you.  Sir, I'm showing you

25  what we marked as Exhibit 5 and ask you to

1    identify that for the record.

2        A.   Minutes of the First Meeting of

3    Shareholders of Sunshine Ranch Company.

4        Q.   I will tell you that the document

5    that we marked as Exhibit 5 was produced to me

6    by your former lawyer.  If you'd like to

7    review it, all I want to know is are these the

8    directors' minutes for Sunshine Ranch?

9        A.   At the time, yes.

10       Q.   All right.  Oh, excuse me.  I'm

11   sorry, Exhibit 5 is the shareholder minutes,

12   isn't it?

13       A.   That's what I said before, Minutes

14   of First Meeting of Shareholders of Sunshine

15   Ranch Company.

16       Q.   Okay.  And you gave those to Mr. Ron

17   Temple; is that correct?

18       A.   I gave Ron Temple the whole Sunshine

19   Ranch corporate book.

20       Q.   Okay.  And if he copied it

21   correctly, then we should have every minute of

22   shareholder meetings, shouldn't we?

23       A.   Yes.

24       Q.   Sir, I'm showing you what we've

25   marked as Exhibit 6.

1          MS. GOODMAN:  I'm going to interject

2     an objection to foundation as to the prior

3     question.

4          Q.  (Mr. Garden) Would you identify

5     Exhibit 6, please?

6          A.  Says Directors' Minutes of Sunshine

7     Ranch First Meeting Board of Directors Waiver

8     of Notice.

9          Q.  And, again, your former lawyer, Mr.

10    Temple, produced Exhibit 6 to us, you're aware

11    of that fact?

12         A.  Yes.

13         Q.  Okay.  Are there any -- well, strike

14    that question.

15          Sir, I'm showing you what we marked

16    as Exhibit 7, and I will tell you I obtained

17    Exhibit 7 from the Antelope County Assessor's

18    Office.  I have a simple question, does

19    Sunshine Ranch own the real estate that's

20    listed in Exhibit 7?

21         A.  Yes, as far as I know without double

22    checking it.

23         Q.  And I'm showing you what we've

24    marked as Exhibit 8 and I will say the same

25    thing, I obtained this from the Pierce County

1    Assessor's Office.

2         A.   Yes.

3         Q.   Does Sunshine Ranch own the real

4    estate on Exhibit 8?

5         A.   Yes, as far as I know without double

6    checking.

7         Q.   And, finally, I'm showing you what

8    we marked as Exhibit No. 9 which I obtained

9    from the Sheridan County Assessor's Office.

10   Does Sunshine Ranch have an interest in the

11   land on Exhibit 9?

12        A.   (No response.)

13        Q.   Which would be the Southwest Quarter

14   of 16-34-43.

15        A.   I'm looking for the acres is what

16   I'm looking for.

17        Q.   Okay, I'm sorry.

18        A.   160 acres, yes.

19        Q.   And who is GJZ Land & Livestock?

20        A.   It's initials for Gary, Jeremy Zak.

21        Q.   Zak is their last name?

22        A.   Zakrzewski, they call it Zak for

23   short.

24        Q.   How would I spell Zakrzewski?

25        A.   Z-a-k-a -- help me out.  It's like

1    the --

2         Q.  Fumblerooski?

3         A.  Yep.

4         Q.  Okay.  That's how we'll go for

5    today.  What's the relationship between

6    Sunshine and I'm just going to call it GJZ

7    Land?

8         A.  The relationship is this Gary Zak,

9    Zakrzewski, basically found us through another

10   guy in 1988 and he wanted to buy a ranch north

11   of Clinton, Nebraska.  And somehow in the

12   whole transition, this one little parcel ended

13   up being Sunshine Ranch and his.

14        Q.  So, is it jointly owned?

15        A.  50/50.

16        Q.  All right.  So, other than the real

17   estate we've looked at in Exhibit 6, 7 and

18   8 -- or excuse me, 7, 8 and 9, does Sunshine

19   own any other land?

20        A.  I produced the stuff to her

21   (indicting to Ms. Goodman).  You guys have

22   seen this, you got it off the county.  I don't

23   know of any other land without researching it.

24        Q.  Has Sunshine sold any land in the

25   last four years?

1          A.  No.

2          Q.  Sir, I'm showing you what we marked

3   as Exhibit 10.  Do you recognize that?

4          A.  I do as a balance sheet for Sunshine

5   Ranch Company from Farm Credit Services of

6   America.

7          Q.  Do you know who prepared the balance

8   sheet?

9          A.  Me, Doug Hall and Kirk Koinzan, the

10  loan officer.

11         Q.  And where is he at?

12         A.  He works out of the Norfolk Farm

13  Credit office.

14         Q.  That balance sheet is dated

15  February 3, 2025, isn't it?

16         A.  It says February 3rd, 2025.

17         Q.  All right.  And at the time did it

18  accurately reflect the assets and liabilities

19  of Sunshine?

20         A.  I sat down with him that day and --

21  yes.

22         Q.  Okay.  So, the balance sheet lists

23  an entity ACP, LLC.  What is ACP?

24         A.  A sow farm, basically comprised of

25  two sow farms now.

1          Q.  What's the relationship between

2     Sunshine and ACP?

3          A.  Sunshine Ranch owns some or roughly

4     47 percent of ACP.

5          Q.  And does Sunshine loan money to ACP?

6          A.  We have.

7          Q.  Exhibit 10 would show a note

8     receivable of nearly 6.2 million?

9          A.  Yep.  Yes.

10         Q.  All right.  Do you expect to collect

11    those funds from ACP?

12         A.  Yes.

13         Q.  Are they making payments to

14    Sunshine?

15         A.  Haven't made any payment yet.

16         Q.  Okay.  The machinery and equipment

17    and vehicles are listed in Exhibit 10, how

18    were those valued?  Are those cost less

19    depreciation or are they fair market, if you

20    know?

21         A.  I think it's probably cost minus

22    depreciation.

23              MR. KELLY:  I'm sorry, I can't

24    understand you.

25         A.  Cost minus depreciation.

1              MR. KELLY:  Thank you.

2         Q.  (Mr. Garden) And then would that

3    also be true for the buildings and

4    improvements in Exhibit 10?

5         A.  I haven't got to them yet.

6         Q.  Okay.

7         A.  I guess I don't see them for some

8    reason.

9         Q.  Let's see.

10        A.  Right there (indicating).  Yes.

11        Q.  Now, it appears to me that Sunshine

12   owns roughly 4,690 acres of farmland, does

13   that sound correct?

14             MS. GOODMAN:  I'm sorry, can you

15   repeat the -- what number did you have?

16             MR. GARDEN:  That was Exhibit 10

17   that we're still on.

18             MS. GOODMAN:  Okay.  No, the number

19   that you stated for the acres.

20             MR. GARDEN:  Oh, I'm sorry.

21        Q.  (Mr. Garden) 4,689 acres is what my

22   math would show, does that seem about --

23        A.  Farmland and pasture.

24        Q.  Okay.  How much of that is pasture,

25   roughly?

1      A.  Half.

2      Q.  And the other half is farmland?

3      A.  Yes.

4      Q.  How much of that farmland then is

5  irrigated?

6      A.  Most of it.

7      Q.  All right.  How much roughly of

8  dryland cropland does Sunshine own?

9      A.  300 acres.

10     Q.  Okay.  Have you had any of this land

11 appraised lately?

12     A.  No.

13     Q.  So how do you value it on the

14 financial statement that we marked as

15 Exhibit 10?

16     A.  I didn't do the value, we just --

17 the banker uses a number and it hasn't been

18 changed for quite awhile.

19     Q.  All right.  So, that's the banker's

20 number?

21     A.  (Witness nodding head yes.)

22     Q.  There's a property called the

23 Coulter 20, C-o-u-l-t-e-r 20, with buildings,

24 what is that?

25      A.  It's a piece of property that I

1    1031'd when we sold a place east of Brunswick,

2    Nebraska two miles and we did 20 acres out of

3    a bigger chunk of real estate that me and my

4    wife bought.

5         Q.   Okay.  So, if you could go through

6    kind of the transaction.

7         A.   Transaction after the 1031?

8         Q.   Well, how did Sunshine acquire the

9    Coulter land?

10        A.   They owned the property east of

11   Brunswick, we sold it, acquired the 20 acres

12   there, my wife and I acquired the rest of the

13   real estate around there.  And probably about

14   a year or two ago I asked all the other

15   shareholders if they would agree if I could

16   buy that because I had sold another piece and

17   I wanted to 1031 that, and that's what I did.

18   So, my wife and I own that now, I think I paid

19   $166,000 for it.

20        Q.   So you now own the Coulter 20?

21        A.   That's correct.

22        Q.   And the other shareholders, that

23   would have been your siblings and your father?

24        A.   That's correct.

25        Q.   Was there like a written consent?

1          A.  Yes, there was.

2          Q.  And what is the Scott Clark

3    240 acres?

4          A.  That's where my sister Kim and her

5    husband Scott Clark live, owned by Sunshine

6    Ranch.

7          Q.  What is the NECC house?  I'm just

8    trying to get an idea of what these things are

9    on the balance sheet.

10         A.  Oh, Northeast Technical Community

11   College house.

12         Q.  All right.  And Sunshine acquired

13   that?

14         A.  Yes.

15         Q.  When?

16         A.  Last fall.

17         Q.  And what's -- why did it buy a

18   house?

19         A.  It bought a house so that I would

20   have somebody to help watch the livestock and

21   the farm.

22         Q.  Do you have, like, a hired man

23   living there?

24         A.  There's nobody living there today,

25   they're pouring a basement concrete -- or the

1    garage concrete today, my daughter and

2    son-in-law plan on moving in there.

3            Q.  And what's your daughter's name?

4            A.  Morgan.

5            Q.  Morgan?

6            A.  Yep.

7            Q.  What's her last name?

8            A.  Penlicker, P-e-n-l-i-c-k-e-r.

9            Q.  The balance sheet lists ACP as

10   having a negative value, why is that?

11           A.  Do you want the long form or the

12   short form?

13           Q.  Just the honest form, the truthful

14   form.

15           A.  The truthful form is after 2020, the

16   hog business hadn't been very good.

17           Q.  And so the negative value takes into

18   account the debt that it has?

19           A.  The debt that it has and trying to

20   sell hog buildings.

21           Q.  All right.  Do you borrow money from

22   Sunshine?

23           A.  I have.

24           Q.  And are those evidenced by

25   promissory notes?

 1          A.   Yes.

 2          Q.   Where would those notes be?

 3          A.   In the income tax form.

 4          Q.   All right.  Do you make payments on

 5     the loans?

 6          A.   I haven't made any.

 7          Q.   When did you incur the debt?

 8          A.   I guess to explain it a little bit.

 9          Q.   You bet.

10          A.   The accountant when I wrote a check

11     to something that looked maybe like I was

12     borrowing money, he just said it was Doug Hall

13     borrowed this money.  I had a niece that got

14     cancer, they had a fundraiser for it and I

15     went to the fundraiser, I spent $7,000 to help

16     raise money for that, and he said Doug Hall's

17     debt.  I had another sister got in trouble,

18     went to jail, spent $30,000 on attorney fees

19     with her, the accountant said Doug Hall's

20     debt.  Several other little things along the

21     way, plus, um, I'd have to look to see what

22     all the items were, but it just -- it was

23     called Doug Hall's debt, and that's the way it

24     stayed.

25          Q.   Who was the accountant that made

1   these recommendations?

2          A.   Bernie Auten.

3          Q.   And is he in Norfolk?

4          A.   Correct.

5          Q.   And so I take it, like, the

6   fundraiser expenditure, you wrote a check on

7   Sunshine for that?

8          A.   Yes.

9          Q.   And the same would be true of your

10  sister that you paid -- or you incurred

11  $30,000 expense for?

12         A.   As far as I remember.

13         Q.   Was that for attorney's fees?

14         A.   There was $30,000 in attorney's

15  fees.

16         Q.   All right.  There's an entry that

17  intrigues me Bitcoin Bernie, what is that?

18         A.   Sometimes your accountant's

19  recommendation is not what you should do.

20         Q.   Okay.

21         A.   He wanted to get in the Bitcoin deal

22  and he had other partners and I put some money

23  in it.

24         Q.   So did Sunshine put money into a

25  Bitcoin investment?

1          A.   In Bernie's own company, he had a

2   company he formed.

3          Q.   Does Sunshine own the Bitcoin or

4   does it own interest in Bernie's company?

5          A.   Own interest in Bernie's company.

6          Q.   About how much?

7          A.   I don't know.

8          Q.   We'd have to ask him?

9          A.   (No response.)

10         Q.   What is AND, A-N-D, Co.?

11         A.   Let me see where you're asking.

12         Q.   Well. . .

13         A.   Did you get way past exhibits?

14         Q.   No, I'm still going through

15  Exhibit 10, it shows an investment in -- okay,

16  I'm referring to page 4 of Exhibit 10, other

17  investments, and it says A-N-D Co., 100

18  shares?

19         A.   If you look at it, it's right above

20  Bowdish Soybean Plant, so we just as well

21  answer that question right now.

22         Q.   All right, so they're one in the

23  same?

24         A.   I'm going to explain, if I may.

25         Q.   That would be great.

1        A.  Sunshine Ranch bought one share of
2   Bowdish stock.  My accountant along with a
3   couple other people said they wanted another
4   person in their partnership to buy one share,
5   so I put in 100,000, and that is the name of
6   their company, but it actually is in the
7   Bowdish Nebraska crush plant.
8        Q.  Okay.  So, that I understand this,
9   there are three shareholders in AND Co.?
10       A.  I don't know who they are.
11       Q.  Okay.  But your accountant and
12   Sunshine, correct?
13       A.  Accountant and Sunshine, I know
14   that.
15       Q.  All right.  And you don't know who
16   else is there?
17       A.  I understand the Dinkels put some
18   money in there.
19       Q.  Dingels?
20       A.  Dinkels, Dinkel Implement in
21   Norfolk.
22       Q.  All right.
23       A.  One of the Dinkels, I don't know
24   which one.
25       Q.  How did you arrive at a value of

1   100,000 for your investment in AND Co.?

2          A.   That was the money put in.

3          Q.   Does it pay dividends?

4          A.   It just started last year.  The

5   grand opening is the end of May.

6          Q.   Of '24?

7          A.   '25.  That is what they call their

8   grand opening, they have been crushing beans

9   since September or October.

10         Q.   So, Bowdish is really referring to

11  the Norfolk Crush entity?

12         A.   That's correct.

13         Q.   And Nick Bowdish was the organizer,

14  correct?

15         A.   Yes.

16         Q.   Did Sunshine invest 250,000 in

17  Norfolk Crush?

18         A.   Yes.

19         Q.   Has it paid any dividends?

20         A.   No.

21         Q.   Who made the decision to invest in

22  Norfolk Crush?

23         A.   Doug.

24         Q.   And the same would be true of AND

25  Co.?

1          A.   Doug.

2          Q.   How does this benefit Sunshine?

3          A.   I feed pigs.  Right now pigs eat

4    soybean meal and corn.  Right now until this

5    plant came in, the people that grind my feed,

6    they haul beans or train beans to Sioux City

7    and haul bean meal back to feed the pigs.

8    It's 90 miles one way.  Norfolk Crush crushes

9    beans, it's less than half the distance.

10          Q.   So presumably there will be a cost

11    savings?

12          A.   Yes.

13          Q.   All right.  So, I'm going to hand

14    you what we marked as Exhibit 11 and ask you

15    to identify that.

16          A.   This is RCU annual fee to 3/5 of

17    '24, Sunshine Ranch Company Balance Sheet

18    Summary.

19          Q.   Was that prepared, again, by you and

20    the loan officer at Farm Credit?

21          A.   He probably did this after he got my

22    information and we sat down, he probably sent

23    it off to Omaha because I don't know what RCU

24    stands for.

25          Q.   Okay.  So, as we sit here today, how

1   much does Sunshine owe Farm Credit?

2        A.  (No response.)

3        Q.  Well, let me back up a little bit.

4   Does Sunshine have an operating loan with Farm

5   Credit?

6        A.  Yes.

7        Q.  About how much is owed on that

8   today?

9        A.  I'm trying to look here.

10        Q.  We probably want to look at 11.

11        A.  That's what I was thinking.

12        Q.  Or 10, I mean.

13        A.  (Witness so doing.)  It says total

14   liabilities 1.396 million.

15        Q.  Operating loans increase and

16   decrease, don't they?

17        A.  At Farm Credit -- yes.

18        Q.  I mean, is this a revolving line of

19   credit where you can draw and pay back and

20   draw again?

21        A.  You have a cap that you can draw up

22   to.

23        Q.  And do you know what your cap is at

24   Farm Credit?

25        A.  I don't know what it is right now.

1    Q.   Other than Farm Credit does Sunshine

2    Ranch owe anybody else money?

3         A.   There is some land payments left,

4    and when I said what we owe Farm Credit, total

5    liabilities 1.3, but that is not what the

6    balance is.   The FCS America operating loan

7    is 1.195662.

8         Q.   As of the date of Exhibit 10,

9    correct?

10        A.   That's correct.

11        Q.   So, you -- Sunshine has some land

12   debt, approximately how much would be owed on

13   the land debt, the unpaid principal?

14        A.   On the -- it probably says right

15   here somewhere.   The Kim and Scott place,

16   there's some money owed on it.   Accounts

17   receivable has ACP, assets -- it says current

18   liabilities, accounts payable are no accounts

19   payable.   Loans are revolving FCS America,

20   last four digits are 1557.   Commitment was 1.6

21   million, maturity at 3/1/25.   Total principal

22   786,602.   Other operating loans, there are no

23   other operating loans.   Term loans, real

24   estate, total principal 68,400.   Other term

25   loans, related party Sumner Hall, 25,000.

1    Total principal 50,000.

2         Q.  So, Exhibit 10 would seem to

3    indicate that the total debt owed by Sunshine

4    as of February 3 of 2025, was a 1,644,562.  Do

5    you see that on page 5, it says all total

6    loans?

7         A.  (No response.)

8         Q.  Right here (indicating).

9         A.  I got a million six.  I don't know

10   where the 45 -- yep.

11        Q.  Are you aware of any other debt that

12   Sunshine owes to people that is not listed in

13   Exhibit 10?

14        A.  No.

15        Q.  Do you own an interest in ACP, LLC?

16        A.  Yes.

17        Q.  How much do you own?

18        A.  Somewhere in the 30 percent range,

19   me and my wife.

20        Q.  And that would be 30 percent for you

21   and your wife?

22        A.  (Witness nodding head yes.)  Total.

23        Q.  I should have asked you, what's your

24   wife's name?

25        A.  Linda Luann.

1        Q.  So, what is the relationship between

2   Sunshine and ACP?

3        A.  Probably if you look on Exhibit 10

4   it tells you how much of ACP that Sunshine

5   Ranch owns.  47 percent -- 49.661 percent of

6   ACP, LLC.

7        Q.  And what does -- why does Sunshine

8   own 49 percent of ACP?

9        A.  In about 1995 a representative of

10  Sands Systems, i.e. Chuck Sands, came to me

11  and my dad, Sumner Hall and said they were

12  looking for property to put a hog farm on.

13  Little beknownst to me they had already

14  figured out where they wanted to put it.

15       Q.  All right.

16       A.  And the representative spent some

17  time with me.  And finally I asked him why are

18  you talking to me, and he said we can see you

19  have some remote locations where you own land,

20  meaning there isn't people around there, or

21  houses, or churches, or cemeteries, and you

22  guys are already in livestock, which we were

23  in cattle, and you're spreading a lot of

24  chicken shit, so you're really not too scared

25  of what it smells like.  We sold them two

1   pieces of property, and -- that's a lie,

2   Sunshine Ranch sold them one piece, my wife

3   and I sold them another piece where the

4   nursery was, they started to build.  We had 10

5   percent ownership.

6           In 2002 Sands tried to buy all

7   these other entities out, i.e. Chuck Sands.

8   We had a meeting, shareholders meeting, and

9   ACP did not get bought out, the original

10  partners were still ACP.  In 2004 the place

11  was now called Furnas County Farms, filed for

12  bankruptcy, front page of the Omaha World

13  Herald about May 12th or 19th.  At that time

14  we decided that the only way we was ever going

15  to get control of this thing was buy some more

16  of the shares out.  So, even though we weren't

17  Furnas County Farms, Chuck Sands and two other

18  of the partners showed a big loss in Furnas

19  County Farms and they came to me and said,

20  hey, our accountant says if you can sell

21  anything it would go against your loss, and I

22  bought three other partners out, Sunshine

23  Ranch ended up with 49 percent of it.

24       Q.  Okay.  So, Sunshine Ranch bought the

25  other three partners out, correct?

1          A.   And my wife and I bought some of it.

2          Q.   All right.  Sir, I'm showing you

3    what we've marked as Exhibit 12.  Do you

4    recognize that document?

5          A.   Yes, Articles of Organization ACP,

6    LLC.

7          Q.   And that's the entity we've been

8    discussing, the hog farming operation?

9          A.   Correct.

10         Q.   Sir, I'm showing you what we marked

11   as Exhibit 13.  Do you recognize that

12   document?

13         A.   Operating Agreement ACP, LLC.

14         Q.   And, again, this is the hog farming

15   operation that Sunshine has an interest in?

16         A.   Yes.

17         Q.   I'm showing what we marked as

18   Exhibit 14.  Do you recognize that document?

19         A.   Articles of Merger of ACP and

20   Nebraska General Partnership with and into

21   ACP, LLC.

22         Q.   Were you a general partner of ACP,

23   the Nebraska General Partnership?

24         A.   At the state?

25         Q.   Yes, sir.

1          A.  Yes.

2          Q.  And did the general partnership get

3     merged into the LLC?

4          A.  Yes.

5          Q.  Why was -- tell me why that

6     transaction occurred, is that a way to move

7     land into the LLC?

8          A.  (No response.)

9          Q.  I realize that occurred in 2008.

10          A.  It seems like when you buy something

11     else, i.e., shares of another company, there's

12     always a trail of stuff that is going to other

13     partners trying to get the thing cleaned up

14     plus trying to separate it out by itself as a

15     new entity.  Even though it was bought in

16     2004, it was suggested I form an LLC, and I

17     did.

18          Q.  Okay.  So, did the general

19     partnership have assets when it was merged

20     into the LLC?

21          A.  Everything that ACP had, yes.

22          Q.  So it had hog buildings and hogs?

23          A.  Yes.

24          Q.  All right.  Sir, I'm showing you

25     what we marked as Exhibit 15.  Could you

1    identify that, please?

2         A.   ACP, LLC Balance Sheet as of

3    October 31st.  Can't tell what the date is.

4         Q.   Do you know who prepared the balance

5    sheet?

6         A.   Swine Management Services out of

7    Fremont, Nebraska, i.e., got bought out by

8    MetaFarms.

9         Q.   All right.  Did you assist in the

10   preparation of Exhibit 15?

11        A.   Just supplied the information.

12        Q.   Did you have to sit down with the

13   accountant in Columbus?

14        A.   It's not an accountant, it's a

15   record keeping service.

16        Q.   Okay.  You give them the information

17   and then they put it into the format of

18   Exhibit 15?

19        A.   Yes.

20        Q.   Exhibit 15 would show that there are

21   long term note liabilities aggregating

22   9.6 million dollars that are entered by ACP.

23   Do you know who those are owed to?

24        A.   Some of it is to Tractor Ranch, some

25   of it is to Sunshine Ranch.

1          Q.  And Sunshine is owed about

2    6.2 million, correct?

3          A.  Correct.

4          Q.  There was a three and a half million

5    dollar capital contribution to ACP in 2023.

6    Do you know who made that contribution?

7          A.  Sunshine Ranch and maybe Tractor

8    Ranch.

9          Q.  What was contributed?

10         A.  Cash.

11         Q.  And why did Sunshine do that?

12         A.  Keep the hog farm afloat.

13         Q.  What is the relationship between

14   Sunshine and Tractor Ranch?

15         A.  My wife and I own Tractor Ranch.

16         Q.  Is that an entity?

17         A.  Tractor Ranch, Inc., yes.

18         Q.  Are there any other shareholders in

19   Tractor Ranch, Inc.?

20         A.  No.

21         Q.  Was any of the cash that Sunshine

22   and Tractor Ranch put into ACP used to pay off

23   bank debt?

24         A.  It was to go into the operating

25   loan.  It was to buy two new roofs for hog

1    buildings.  It was to buy new equipment for

2    the farrowing barn.

3              Q.  To upgrade the operation?

4              A.  Yes.

5              Q.  Sir, I'm showing you what we marked

6    as Exhibit 16.  And I will tell you even

7    though we've stapled them together there are

8    two real estate tax statements from Webster

9    County, Iowa.  Do you recognize those?

10             A.  Yes.

11             Q.  So on page 1 of Exhibit 16, what is

12   that approximately 25 acres in Webster County?

13             A.  Sow farm.

14             Q.  And then on page 2, what is that?

15             A.  Sow farm.

16             Q.  All right.  And that's owned by Sun

17   -- or excuse me, by ACP, correct?

18             A.  Correct.

19             Q.  Sir, I'm showing you what we marked

20   as Exhibit 17.  Do you recognize that?

21             A.  Yes.

22             Q.  And, again, it's two documents?

23             A.  Yes.

24             Q.  So, what is the real estate in the

25   two documents that we marked as Exhibit 17?

1         A.   It's the land that the sow farm, the

2    buildings set on, and a lagoon.

3         Q.   About how many acres would that be?

4         A.   You just quoted it.

5         Q.   Oh, so it's the 25 acres?

6         A.   Yes.

7         Q.   All right.  Did ACP acquire that

8    property for 2.45 million dollars, do you

9    know?

10        A.   The asking price and what I paid for

11   it was three and a half million.

12        Q.   Okay.  So ACP paid 3.5 million?

13        A.   (Witness nodding head yes.)

14        Q.   When did that occur?

15        A.   2021, maybe.

16        Q.   And you nodded your head 'yes' to my

17   prior question.

18        A.   Repeat your prior question.

19        Q.   Is it true that ACP paid three and a

20   half million dollars to acquire the real

21   estate identified in Exhibit 17?

22        A.   Yes.

23        Q.   And then showing you what we marked

24   as Exhibit 18.  Do you recognize that

25   document?

1          A.   Basically Antelope County Assessor

2    Parcel Information.

3          Q.   Would Exhibit 18 show the assessed

4    value of an ACP hog facility in Antelope

5    County?

6          A.   Yes.

7          Q.   When did ACP acquire that land and

8    facility?

9          A.   Going back to my further -- prior

10   information about 1995 that he approached us.

11   ACP was formed by Sands Systems, i.e. Chuck

12   Sands, it's built on our place.

13         Q.   Okay.  So, this is -- Exhibit 18

14   would be the original ACP hog farm that you

15   testified to earlier?

16         A.   Yes.

17         Q.   All right.  What did ACP pay to

18   acquire that land?

19         A.   Do you want a wild-ass guess?

20         Q.   If you don't know.

21         A.   I don't know, but I can tell you

22   they didn't pay any more than pasture value

23   for the land.

24         Q.   Whatever the pasture value was back

25   then?

```
 1              A.  Yes.
 2              Q.  Sir, I'm handing you what we marked
 3       as Exhibit 19.  Do you recognize that
 4       document?
 5              A.  Corporate Warranty Deed, yes.
 6              Q.  Is Exhibit 19 the deed from Sunshine
 7       to ACP for the Antelope County hog facility?
 8              A.  Yes.
 9              Q.  Sir, I'm showing you what we marked
10       as Exhibit 20.  Do you recognize that
11       document?
12              A.  Pierce County Assessor, yes.
13              Q.  And, again, that's for property
14       owned by ACP?
15              A.  Yes.
16              Q.  Approximately 11 and a half acres in
17       Pierce County?
18              A.  Yes.
19              Q.  What does ACP use this land for?
20              A.  It has two nursery buildings on it
21       and one house.
22              Q.  Who lives in the house?
23              A.  No one.
24              Q.  That could be a hired man's house?
25              A.  Yes.
```

```
 1              Q.  Are you aware of any other property
 2     owned by ACP other than the property in Iowa,
 3     the swine facility, and this nursery facility?
 4              A.  No.
 5              Q.  Sir, I'm showing you what we marked
 6     as Exhibit 21.  Could you identify those -- or
 7     that exhibit for me?
 8              A.  Yes.
 9              Q.  And what is it?
10              A.  Sunshine Ranch Company,
11     Incorporated, Form 8879 for income tax.
12              Q.  Would that be Sunshine's year 2022
13     federal tax returns and accountant transmittal
14     papers?
15              A.  Yes.
16              Q.  Has Sunshine filed a tax return for
17     2023?
18              A.  No.
19              Q.  Is there a reason why it has not?
20              A.  I need to back up.  For 2023?
21              Q.  Yes, sir.
22              A.  Yes, they have.
23              Q.  Okay.
24              MR. GARDEN:  Is that something --
25              MS. GOODMAN:  I have it.
```

1           MR. GARDEN:  Okay.

2           MS. GOODMAN:  Yeah.

3       A.  I was going to say she should have

4 got it as an e-mail two weeks ago.  I stopped

5 in there last Friday, I told them to resend it

6 to her, so she has it.

7       Q.  (Mr. Garden) All right.

8           MR. GARDEN:  Lauren, would you share

9 that with me?

10           MS. GOODMAN:  I will, absolutely.

11           MR. GARDEN:  Thank you.

12       Q.  (Mr. Garden) Is there a relationship

13 between Husker Ag Processing and Sunshine

14 Ranch?

15       A.  At one time Husker Ag had shares

16 that were owned by Sunshine Ranch.

17       Q.  Sunshine owned part of Husker Ag?

18       A.  Some shares in Husker Ag, yes.

19       Q.  Does Sunshine continue to own any

20 stock in Husker Ag?

21       A.  No.

22       Q.  Husker Ag was a --

23       A.  Ethanol producing, corn grinding

24 plant east of Plainview.

25       Q.  Did it fail?

1        A.  No.

2        Q.  Why did Sunshine sell its shares in

3   Husker Ag?

4        A.  I don't know.

5        Q.  Okay.  Sir, I'm showing you what we

6   marked as Exhibit 22 and ask you do you

7   recognize that?

8        A.  Sunshine Ranch Company General

9   Ledger as of August 31st, 2022.

10       Q.  So, do you know who prepared the

11   original of this general ledger?

12       A.  My guess is Bernie Auten.

13       Q.  Do you provide the information to

14   Mr. Auten for the general ledger?

15       A.  Yes.

16       Q.  And do you believe this to be

17   accurate?

18       A.  Yes.

19       Q.  Who's Jennifer Thompson?

20       A.  Jennifer Thompson was a secretary

21   turned into manager for a company called

22   Sidump'r that built side dump trailers in

23   Plainview, Nebraska.

24       Q.  Why did Jennifer Thompson owe

25   Sunshine money?

1       A.  If I remember right -- I don't even

2   know what date it was.

3       Q.  That's on page 5 of Exhibit 22,

4   there are -- it shows an account receivable

5   Jennifer Thompson.

6       A.  Page 5, line 2.  I'm on page 5.

7       Q.  Well, let's see.  Let me see if I

8   can't -- okay, reading upside down is not my

9   forte.  Here we go.

10          MS. GOODMAN:  What page is that on?

11      A.  Page 5.

12          MS. GOODMAN:  Page 5.

13      Q.  (Mr. Garden) It says AR Jennifer

14  Thompson.

15      A.  I think she asked for a loan.

16      Q.  Okay.  Also on that page is a

17  receivable 'brother', who would the brother

18  be?

19      A.  I'm trying to find that, too.

20      Q.  Here.

21          MS. GOODMAN:  Down at the bottom.

22      Q.  (Mr. Garden) Yeah, there we go.

23  Very last entry.

24      A.  10,530, I don't know.  It looks like

25  that's above that, though, so it must be on

1    the next page.  10,530, I don't know.

2          Q.  You don't know who the brother is?

3          A.  (Witness shaking head no.)

4          Q.  Did Sunshine loan some money to one

5    of your siblings?

6          A.  Maybe.

7          Q.  Okay.  Page 6 of Exhibit 22 shows a

8    note receivable, Morgan and Katelyn Hall, are

9    those your children?

10         A.  Yes.

11         Q.  And did Sunshine lend money to your

12   children?

13         A.  Yes.

14         Q.  Why?

15         A.  We bought a feedlot south of

16   Plainview, Sunshine got everything on top of

17   the ground and the daughters got everything

18   below the ground, everything on the land, and

19   they didn't have the money so they borrowed

20   the money and they've been making payments.

21         Q.  So, the feedlot, Sunshine owns the

22   improvements?

23         A.  That's correct.

24         Q.  And your daughters own the real

25   estate?

```
1          A.   Correct.

2          Q.   Is Sunshine feeding cattle there?

3          A.   No.

4          Q.   Does somebody else?

5          A.   Not now.

6          Q.   Is the feedlot in operation?

7          A.   If there's no cattle there it's not

8     in operation.

9          Q.   Sir, I'm showing you what we marked

10    as Exhibit 23, would you identify that,

11    please?

12         A.   Sunshine Ranch Company General

13    Ledger as of August 31st, 2023.

14         Q.   Who prepared it?

15         A.   Bernie Auten.

16         Q.   Who provided Mr. Auten with the

17    information for Exhibit 23?

18         A.   Me and the bank.

19         Q.   Be Farm Credit?

20         A.   And Brunswick State Bank.

21         Q.   I note on page 11 Sunshine made a

22    payment to James Meuret.  Is James one of

23    Sunshine's lawyers?

24         A.   Yes.

25         Q.   What kind of work does James do for
```

1    Sunshine?

2         A.  It has a reference there that says

3    'pipeline'.

4         Q.  So, did that have something to do

5    with the Keystone Pipeline?

6         A.  No, the carbon pipeline.

7         Q.  Okay.  And what services did

8    Mr. Meuret provide to Sunshine?

9         A.  He negotiated a price for them to

10   get an easement to go across Sunshine Ranch's

11   land.

12        Q.  All right.  Do you know who

13   Christian Zuhlke is?

14        A.  Yes.

15        Q.  Who is he?

16        A.  He's an adopted son of Lisa and

17   Alden Zuhlke.

18        Q.  Do you know was Christian Zuhlke

19   involved in Alden and Lisa's farm operation?

20        A.  Yes.

21        Q.  How was he involved?

22            MS. GOODMAN:  Objection, foundation.

23        Q.  (Mr. Garden) You can go ahead and

24   answer.  How was Christian involved in the

25   Zuhlkes' farming operation?

1          A.   He was adopted as a younger boy.

2          Q.   Yes, sir.

3          A.   Ran around with his bare feet in the

4    pig shit and then grew into scooping shit and

5    maybe doing other things.

6          Q.   All right.  So, labor?

7          A.   As far as I know.

8          Q.   Do you know where Christian Zuhlke

9    lives today?

10          A.   I have an address.

11          Q.   Would that be the 1811 Tillery

12    Street in Austin, Texas?

13          A.   As far as I know.

14          Q.   What do you know about the house

15    that Mr. Zuhlke, Christian, lives in?

16          A.   Just know who it says it's owned by.

17          Q.   Do you know who it's owned by?

18          A.   It says somebody that has something

19    to do with RAI.

20          Q.   RAI, LLC?

21          A.   Yes.

22          Q.   Do you know anything about RAI, LLC?

23          A.   Nothing except what you can read on

24    the internet.

25          Q.   Was Christian to your -- well, do

```
1   you know was Christian a farm manager for an
2   entity known as Diamond Z Farms?
3        A.  That's what his resume says.
4        Q.  Would that be something you also
5   read on the internet?
6        A.  Yep.
7        Q.  Do you know what Diamond Z Farms is?
8        A.  Yes.
9        Q.  What is it?
10       A.  Diamond Z Farms evolved from Lazy Z
11  Farms, and entity that Lisa and Alden Zuhlke
12  were in charge of or owned.  Lazy Z started
13  with two other brothers and they split off
14  quite a few years ago.
15       Q.  Two other brothers of Alden's?
16       A.  Yes.
17       Q.  And do you know their names?
18       A.  Jerry Zuhlke and Eugene Zuhlke.
19       Q.  Now, I want to focus -- we've talked
20  an awful lot about Sunshine, I want to talk
21  about Lisa and Alden Zuhlke.  Did you ever
22  talk to Lisa or Alden about her ownership in
23  Sunshine Ranch?
24       A.  Yes.
25       Q.  When?
```

1     A.  Probably mid June of 2024 the

2   subject came up.

3        Q.  Where were you?

4        A.  I was in the Sidump'r building in

5   Plainview.

6        Q.  And who all was present?

7        A.  She brought my dad in, they saw the

8   doors open, I was in there with Randy Golden,

9   the previous owner of Sidump'r hooking up an

10  air compressor.  Randy Golden and my dad

11  walked off and Lisa was standing there beside

12  me and that's when it came up.

13       Q.  So only you and Lisa were present

14  during this conversation?

15       A.  Yes.

16       Q.  What did the two of you discuss?

17       A.  I asked, 'What is your plan?', and

18  she goes, 'I don't know what you're talking

19  about.'  And I said, 'Lisa, we've been

20  watching this thing for a year and a half, I'm

21  concerned.  What are you concerned about?'  I

22  said, 'We've been reading this stuff,' and at

23  one point it said she lied.  I said, 'It

24  didn't say Lisa lied, it said 'she lied', I

25  assume it was you.  What do you mean, Doug?'

1    I said, 'I saw what you guys filed.  When you

2    filed for bankruptcy, your assets, you didn't

3    mention Sunshine Ranch, that you owned some of

4    that.'  She said, 'I was trying to keep them

5    out of it.'

6         Q.  So, I take it that this June of 2024

7    conversation, you knew that Lisa and Alden had

8    not listed their ownership in Sunshine --

9    listed her ownership in Sunshine Ranch in the

10   bankruptcy papers?

11        MS. GOODMAN:  Object to form.

12        A.  Yes.

13        Q.  (Mr. Garden) How did you know that?

14        A.  It's in the box over there, it's

15   public information (indicating).

16        Q.  Something that was filed with the

17   bankruptcy court?

18        A.  Yes.

19        Q.  How did you find those papers that

20   showed that they had not listed Lisa's

21   ownership in Sunshine?

22        A.  You could subscribe, pay some money

23   to get public information.  I did not do it,

24   somebody else did.

25        Q.  Somebody else gave you the

1   bankruptcy papers?

2          A.  Yes.

3          Q.  And so when you confronted Lisa

4   Zuhlke in June of 2024, she told you she was

5   trying to keep them out of it?

6          A.  Yes.

7          Q.  What did you understand that to

8   mean?

9              MS. GOODMAN:  Objection, foundation.

10         Q.  (Mr. Garden) You can go ahead and

11  answer.

12         A.  That's a tough one.  I didn't know

13  how to take it.

14         Q.  Did you have any follow-up questions

15  of her?

16         A.  No.  About that time my dad and

17  Randy Golden came back and they walked off.

18         Q.  Okay.  Other than this conversation

19  in June of 2024 with Lisa Zuhlke, have you had

20  any subsequent conversations with either Alden

21  or Lisa concerning their ownership in

22  Sunshine?

23         A.  Yes.

24         Q.  When would that have occurred?

25         A.  Maybe about two months later, maybe.

1    I don't know for sure.  I wasn't keeping a

2    time clock on it.

3           Q.  Roughly, August of 2024?

4           A.  Probably.

5           Q.  Who did you talk to at that point?

6           A.  I met Lisa after I called her out in

7    her front lawn in her driveway in front of her

8    house.

9           Q.  All right.  Then what did the two of

10   you discuss?

11          A.  Basically, 'Do you have a plan?'

12   And it seemed like it was -- I have a lot of

13   words for it, but I can't say them right now,

14   but it was, like, not really.  And I said,

15   'That piece of ground right over there', and I

16   was standing in her driveway, I said 'Meurets

17   want that piece of ground so bad they can

18   taste it, you better figure out a plan.'

19          Q.  What ground were you referring to?

20          A.  The ground right across the road

21   from their place that right now is in the

22   Court case that you guys are fighting these

23   two boys that are sitting in the audience

24   about (indicating).

25          Q.  Okay.  So, it's ground that was sold

1    to either Derek or Dillan?

2          A.  Yep.

3          Q.  What specifically in this August of

4    '24 discussion with Lisa related to Sunshine

5    Ranch?

6          A.  I am a doer.

7          Q.  Okay.

8          A.  I try to figure out what my options

9    are.  I wanted to know if they had a plan or

10   if there was any way that we could work

11   something out to get them out of the mess that

12   they were in.  I am owner in Sunshine Ranch,

13   she was owner in Sunshine Ranch.  I thought

14   that me being there and talking to her had

15   some relevance to what was going on.  And

16   believe me after this pile (indicating), I

17   think I was right.

18         Q.  Did you specifically mention

19   Sunshine Ranch stock in your August

20   conversation with Lisa?

21         A.  I probably did, but I can't remember

22   if I specifically did.

23         Q.  What do you recall about that part

24   of the conversation?

25         A.  It was after I had met their

1    attorney at Antelope County Court, after I had

2    heard that they had a family meeting, after I

3    had heard that their attorney had quit, their

4    bankruptcy attorney had quit, after I had

5    heard that they disclosed Sunshine Ranch that

6    she owned 11 percent of it.  That did not

7    answer your question, but it probably had

8    something to do with, 'Do you have a plan?'

9         Q.  All right.  So, as of your

10    conversation with Lisa in June of 2024 at the

11    Sidump'r --

12         A.  Yes.

13         Q.  -- did you mention her ownership in

14    Sunshine Ranch?

15              MS. GOODMAN:  Objection, form.

16         A.  In June?

17         Q.  (Mr. Garden) Yes, sir.

18         A.  Yes, I said, 'Your bankruptcy deal

19    did not show Sunshine Ranch.'  She said, 'I'm

20    trying to keep them out of it.'

21         Q.  All right.  And nothing --

22         A.  Or we were trying to keep them out

23    of it, or something about trying to keep them

24    out of it.

25         Q.  And I take it there was no follow-up

1   on keeping them out of it?

2          A.   (Witness shaking head no.)

3          Q.   You're shaking --

4          A.   No.   The follow-up was I went to the

5   court as John Lentz' testimony in his

6   deposition said, I sat there all day to meet

7   the attorney, can't figure out why he would do

8   that.

9          Q.   Which attorney are you talking

10  about?

11         A.   Stover, Ryan Stover.

12         Q.   So, what court did you sit through

13  all day?

14         A.   Antelope County Court, and it might

15  have been District Court, I can't tell the

16  difference, but they were supposed to appear

17  there that day and I figured their attorney

18  would be there that day, and he was.

19         Q.   Did you have a conversation with

20  Mr. Stover that day?

21         A.   Yes.

22         Q.   What did the two of you discuss?

23         A.   Outside the courtroom, probably

24  about 3:30, I introduced myself.   I said I was

25  a brother of Lisa Zuhlke, a member ownership

1  of Sunshine Ranch Company along with Lisa

2  Zuhlke and I was concerned.  And he said,

3  'I already know about it.  We already got it

4  handled.'

5      Q.  And that was the extent of the

6  conversation?

7      A.  Pretty much it.

8      Q.  You had retained Mr. Ron Temple, a

9  Norfolk lawyer, to assist Sunshine, didn't

10  you?

11      A.  Yes.

12      Q.  And why did you do so?

13      A.  I consider Ron Temple a friend, he

14  has handled other issues for me, with me, I

15  know some of his mutual acquaintances.  I had

16  been telling him, and the bank, and the

17  accountant about this deal for quite some

18  time, and everybody just said doesn't look

19  like nothing to me.  And when I figured out it

20  was going to be something when they identified

21  Sunshine Ranch Company as one of their assets,

22  I decided I needed to get an attorney.

23      Q.  All right.  Let me kind of go back

24  and fill in some details.  You said you

25  identified the bank and an accountant, what

1    bank was that?

2         A.  I had been talking to Kirk Koinzan

3    at Farm Credit about this situation for awhile

4    because we had been accumulating this stuff

5    for a year and a half.  I had been talking to

6    Bernie Auten, the accountant.  I had been

7    talking to Ron Temple about this.

8         Q.  Was this before Alden and Lisa

9    disclosed their ownership in Sunshine Ranch to

10   the bankruptcy court?

11        A.  A lot of it was.

12        Q.  Do you know did you ask Mr. Temple

13   to call me about Sunshine Ranch?

14        A.  I don't recall.

15        Q.  All right.  Did you tell Alden and

16   Lisa Zuhlke that you're going to have to

17   inform the Court about her ownership in

18   Sunshine?

19        A.  No.

20        Q.  Do you recall the date that you

21   spoke with Mr. Stover in the Antelope County

22   Courthouse?

23        A.  I don't know, but it was one of

24   their court dates.

25        Q.  Do you know was it in the summer?

1        A.   It was in the summer.

2        Q.   Would it have been July, August?

3        A.   It would have been sometime late

4    July or first part of August.

5        Q.   And when you told him about her

6    ownership he said that we've got that handled?

7        A.   In so many words, yes.

8        Q.   All right.

9        A.   He said, 'I already know about it.'

10   And I think at the time I didn't know who the

11   bankruptcy attorney was and I didn't know that

12   he had already quit, so.  .  .

13       Q.   And you're speaking of Mr. Lentz?

14       A.   John Lentz.

15       Q.   All right.  Do you know where Lisa

16   Zuhlke's stock certificates are?

17       A.   I know where some of them are.  The

18   rest of them are just identified by what's in

19   the book there.  I don't know where the other

20   ones are.

21       Q.   You said you know where some are and

22   I'm speaking in terms of the original share

23   certificates.

24       A.   Right.

25       Q.   Where are they?

1    A.  Supposed to be in Philip Kelly's

2    office in Scottsbluff.

3    Q.  All right.  And other than those

4    that are supposed to be with Mr. Kelly,

5    you're -- you don't know where the other

6    original shares are?

7    A.  No.  Do you want me to elaborate on

8    that?

9    Q.  That would be great.

10    A.  I hadn't looked in the book in

11    years, I assumed they were there.  The book

12    went to another attorney within the last two

13    years to do a little bit of work on dad's

14    estate, Dennis Collins with Collins and

15    Jewell, which Jewell is no longer around.

16    When this thing started heating up, Ron Temple

17    asked Jewell if he could have the book.  He

18    got the book.

19         Every time I went to his office I

20    sat here, he sat there, and the book was over

21    there in the corner (indicating) and he was

22    relaying messages to you guys, documents

23    whatever.  I never looked at the book.  Every

24    time I went down there I said you -- 'I wish

25    you would put that thing in a safer spot.'

1   And every time I went down there it was still

2   sitting in the same spot.

3           When I decided in my infinite

4   stupid wisdom or whatever you want to call it

5   that this thing was beyond me saving, fixing,

6   doing this deal, I decided that I was just

7   going to give Philip Kelly what he asked for

8   to begin with, the stock certificates.  I can

9   make a lot of other comments, but that's what

10  I decided.  And when I said that, Ron said,

11  well, you know -- I said, 'No, that's what I

12  want to do.'  And so he went over and got the

13  book and we looked in there and he said,

14  'Well, it's right here and right here and

15  right here.'  And I go, 'Whoa, whoa, that

16  doesn't have a certificate with it.'  And he

17  looks underneath it, 'Well, I thought it was

18  folded underneath'.  And I said, 'No, it's not

19  there.'

20          And he got to looking and I said,

21  'I've already made my decision, I'm going to

22  give this to Philip Kelly.'  'You're going to

23  drive to Scottsbluff?'  I said, 'I can drive

24  to Scottsbluff.'  And he said, 'Well, I got to

25  do a little work here, and I don't know

1  whether he said work or what he said, but I

2  suppose it was notify you guys.

3              (A brief interruption occurred.)

4        A.   Was that Subway?

5        Q.   (Mr. Garden) No, that was the

6  Sheriff -- or a deputy.

7        A.   Must be looking for you.  Anyhow,

8  probably to notify you people that he'd just

9  been fired.  And I told him the next day I

10  wanted the book, and I met him at his house.

11  And in between there I figured out where some

12  of the stock certificates were just by

13  happenchance, because my mom moved out of a

14  house in Plainview that I -- she had been

15  living in rent free, into an apartment and she

16  left back a diary, which I have over there

17  (indicating), and it said I told Kevin that

18  his stock certificates were in a cupboard

19  above the sink at Sidump'r and Kevin picked

20  them up.

21              I never knew the stock certificates

22  were in the book, I had never researched that,

23  I never looked.  So, I asked my brother, first

24  I went to Sidump'r and looked and there was

25  nothing there, I looked all over hell.  Did I

1   say hell in a deposition?

2        Q.   That fine.

3        MS. GOODMAN:  You just did.

4        A.   Anyhow, called by brother and he

5   said, 'Yeah, I got my stock certificates they

6   were here.'  So then I went to my mom.  My mom

7   and dad got a divorce in 1993.  I always

8   thought the book was in a fire safe file, it

9   was there, I never looked at it.

10        When we needed it for Dennis

11  Collins I got it out and gave it to him.  When

12  I couldn't find it at the Sidump'r I called my

13  brother and he said yep, that's what the deal

14  was.  Then I went to my mom and she goes,

15  'They're in the safe at Sidump'r.'  I said, 'I

16  don't have a safe at Sidump'r.'  'Well, your

17  brother, Troy, had a safe and they're in that

18  safe.'  I went to Sidump'r there was a safe, a

19  little thing like this (indicating).

20        She told me what the combination

21  was, it was wrong.  I took the thing apart,

22  looked at the batteries, tried to figure it

23  out, got the thing opened without breaking it,

24  and sure as hell the group of stock

25  certificates that were Lisa's that were in

1    there correlated with the group of stock

2    certificates that were mine that were in

3    there, correlated with the group of stock

4    certificates that were Kevin's were in there

5    -- or Kim's that were in there, but not

6    Kevin's, but that it wasn't complete.

7         Q.  So, some original certificates were

8    in the small safe at Sidump'r?

9         A.  Yep.

10        Q.  Including Lisa's?

11        A.  Yes.

12        Q.  But not all of Lisa's original

13   shares?

14        A.   Not all of Lisa's, because what I

15   did was I took the -- that day -- the next day

16   I said, 'Ron, I'm coming to get the book.'

17   And like normal, I don't sometimes get off at

18   5 or 4:30, and I said, 'I'm running a little

19   late.'  He said, 'I'll have the book at my

20   house.'  Backed up to his house, I had the

21   safe, I opened it up.  I said, 'Here's some of

22   the certificates, let's look at the book.'

23            Looked at the book, I figured out

24   which ones were missing.  He said, 'What are

25   you going to do?'  I said, 'I'm taking this

1   down to Philip Kelly.'  Because the next day

2   we were supposed to have a deposition and I

3   figured he's going to be in the office.

4        Q.  So to kind of recap, you took the

5   corporate book that had been in Mr. Temple's

6   office and added to it the original share

7   certificates you found at the Sidump'r

8   building; is that correct?

9        A.  Of Lisa's, nobody else's.

10        Q.  Okay.  So, you only added Lisa's

11   original share certificates?

12        A.  That were not complete.

13        Q.  So then the original corporate book,

14   you drove to Scottsbluff and delivered to

15   Mr. Kelly; is that correct?

16        A.  To his office.

17        Q.  All right.  So, other than those

18   original share certificates that you believe

19   were delivered to Mr. Kelly's office, you

20   don't know where the others are?

21        A.  I do not.

22        Q.  Sir, I'm going to show you what we

23   marked as Exhibit 24.  Could you identify

24   that?

25        A.  It says Owner's Name, Register --

1    Title Lien and Register of Records, Nebraska

2    Department of Motor Vehicles.

3         Q.  So, did you send Exhibit 24 to me?

4         A.  I did.

5         Q.  Why did you do so?

6         A.  Why did I do so?  That is a very

7    good question.  Now I got to decide why did I

8    do that?

9         Q.  Yes, sir.

10        A.  Short of repeating myself, I decided

11   that I wasn't going to save this situation.

12        Q.  'This situation' being Alden and

13   Lisa's financial issues?

14        A.  Yes.

15        Q.  Okay.

16        A.  But there was a turning point

17   different times, which you didn't ask about,

18   but I'll tell you.

19        Q.  All right.

20        A.  I have asked several times to the

21   family including the two boys in the audience

22   if they're needing some help.

23        Q.  That would be Derek and Dillan?

24        A.  Yep.  And one of them at one time

25   they said, 'No, not at this time.'  And the

1   other time says, 'We're going to be bidding

2   tomorrow.'  And one time in a text says, 'I'm

3   going to be bidding tomorrow, please don't bid

4   against me.'

5        Q.  The bidding, was that the execution

6   sale conducted by the Antelope County

7   Sheriff's Office?

8        A.  One of them.

9            MS. GOODMAN:  If I could -- I want

10  to interject an objection and I would ask that

11  it precede Mr. Garden's question, and I'm

12  going to object to that whole answer as not

13  responsive to Mr. Garden's question.

14           MR. GARDEN:  Would you read back my

15  last question because I have forgotten it?

16           COURT REPORTER:  I will.

17       A.  'Why did you give this to me?'

18       Q.  (Mr. Garden) Correct.  And did you

19  give this to me because you wanted to assist

20  the bankruptcy court or the bankruptcy trustee

21  in recovering assets?

22           MS. GOODMAN:  Objection to form.

23       Q.  (Mr. Garden) You can answer.  We're

24  getting close to home.

25       A.  I did this because I'm tired of the

1  lies that have been told.  I want to get

2  Sunshine Ranch out of this one way or the

3  other.

4       Q.  What lies do you believe have been

5  told and by whom?

6       A.  That they have no other personal

7  property.

8       Q.  'They' being Alden and Lisa Zuhlke?

9       A.  Yes.  And that we have nothing, and

10  you kicked us when we were down, and that the

11  Sheriff said he could not find any other

12  stuff.

13       Q.  Now, did -- you're aware that Rabo

14  Agrifinance filed an action to recover

15  possession of its collateral from Alden and

16  Lisa Zuhlke, aren't you?

17            MS. GOODMAN:  Objection to form.

18       Q.  (Mr. Garden) Are you?

19       A.  Yes.

20       Q.  You're aware that Rabo sued the

21  Zuhlkes to get its collateral back, correct?

22            MS. GOODMAN:  Same objection.

23       A.  Yes.

24       Q.  (Mr. Garden) How are you aware?

25       A.  It's public record.

1          Q.   In the Antelope County Courthouse?

2          A.   In the files over there in Antelope

3    County, yes.

4          Q.   Did you ever discuss that litigation

5    with Alden and Lisa?

6          A.   At their kitchen table they said

7    they were finally ready to talk sometime

8    maybe, I don't know when, maybe November.

9          Q.   Of what year?

10         A.   2024.

11         Q.   And did they visit with you about

12   their situation with Rabo?

13         A.   Yes.

14         Q.   What did they tell you?

15         A.   But did not mention Rabo, they

16   mentioned the bank, which I knew was Rabo.

17         Q.   Okay.  What did Alden and Lisa tell

18   you about the bank?

19         A.   I asked them, again, 'Do you have a

20   plan?  No, we don't have a plan.  Do you have

21   an attorney?  No, we're trying to find one.

22   Did you sign the note, Lisa, to Rabo bank?

23   Yes.  I said this thing is pretty simple.  You

24   borrowed that money, you signed the note, the

25   bank wants their money back.  We have

nothing.'  I said I'm not here -- and she

started bawling, 'I'm not here to listen to

your emotions.  I'm here to try to figure this

out.  Do you have a plan?'  I said, 'They want

Derek's house.'  I was trying to see if they

would get some sort of seriousness here.  'If

that's what they want, they don't want any

young farmers around here, let them have it.'

I said, 'You guys are going to jail.'  I said

it three times.

Q.  And what was either Alden or Lisa's

response?

A.  I said they're going to try to

prove -- it's already in the court documents

what you guys are going to try to prove.  You

sold Derek's house to him too cheap, you sold

land to Derek and Dillan too cheap, and

they're going to try to prove that.  And Alden

said, 'What did they pay for the ground

underneath the hog barn?'  He's sitting closer

than she (indicating to court reporter) is to

me, and I'm going, what did they pay for the

ground underneath the hog barn?

He gets up out of his chair and I

start getting up and he shoved me and he said,

1   'What did they pay for the ground underneath

2   the hog barn?'  And he shoved me again and

3   Lisa said, 'Stop, Al, stop.'  And I said,

4   'You touch me one more time,' and I walked

5   out.  I haven't talked to him since.  I've

6   talked to Lisa since.

7        Q.  Okay.  What have you and Lisa

8   discussed?

9        A.  That was one of the turning points,

10  she was helping my mom move out of the house.

11       Q.  All right.

12       A.  She had a pickup backed up, not

13  really close to the house, but she was loading

14  stuff into it.  My mom was in the house.  And

15  I asked her a few questions and she said, 'You

16  were kicking us when we were down.'  'Okay,

17  whose pickup is that?'  It's a 7 county

18  pickup, I didn't recognize it.  She kind of

19  paused a little bit, 'that's Darin's.'

20       Q.  And Darin is one of Alden and Lisa's

21  sons?

22       A.  Yep.

23       Q.  All right.  What other conversation

24  did you have with Lisa that day?

25       A.  She walked off, drove off, left,

1   left mom sitting there, but stupid Doug didn't
2   get the license plate number.
3          Q.  But you're sure it's a Madison
4   County plate?
5          A.  I know it's 7 county.
6          Q.  All right.  And that is Madison
7   County?
8          A.  But we checked it out later, found
9   the license plate number.
10         Q.  And who do you believe owns the
11  vehicle that Lisa was driving that day?
12         A.  Supposedly --
13         MS. GOODMAN:  And I'm going to
14  object on form and foundation.
15         Q.  (Mr. Garden) You can go ahead and
16  answer.
17         A.  It's titled and registered in two
18  different states.
19         Q.  All right.  Tell me how -- what you
20  looked at to conclude that this 7 county
21  vehicle is titled in two states.
22         A.  Run the license plate.
23         Q.  Through Nebraska Department of Motor
24  Vehicles; is that correct?
25         A.  Yep.

1    Q.  And who did you determine that

2    pickup was titled to?

3        A.  If I tell you right now I'd be

4    lying, but I knew at the time, it's my deal

5    over there (indicating), it's titled, we

6    think, to Darin or one of his entities

7    registered something different, but I don't

8    know which one is which.

9        Q.  So, what other state do you believe

10   that vehicle was registered in?

11       A.  Texas.

12       Q.  And upon what do you base that

13   belief?

14       A.  What the Court records -- courthouse

15   records say.

16       Q.  In Texas?

17       A.  In Nebraska.

18       Q.  Okay.  That would be the Madison

19   County Courthouse records?

20       A.  Antelope.

21       Q.  I'm really confused.

22       A.  Antelope, one of them, I do not

23   know.  I did not research it.  I asked

24   somebody to run the plates.

25       Q.  Okay.  Who ran the plates for you?

1          A.  I'm going to plead the Fifth.

2          Q.  It's really not relevant, so -- was

3     it law enforcement?

4          A.  No.

5          Q.  All right.  So, sir, I'm showing you

6     what we marked as Exhibit 25, which is a whole

7     stack of photos; do you recognize that?

8          A.  I recognize the first one --

9          Q.  What is the first --

10          A.  -- and the second one, and the third

11     one, so I probably recognize them all.

12          Q.  All right.  I'm going to pull out my

13     copy and then we'll just kind of go through

14     this page-by-page.  Did you take the

15     photographs in Exhibit 25?

16          A.  Yep.  Yes.

17          Q.  About when did you do that?

18          A.  I could look on my phone for the

19     exact date.

20          Q.  In 2025?

21          A.  Yes.

22          Q.  So, the first one is a Dodge Ram

23     pickup, isn't it, page 1?

24          A.  Yes.

25          Q.  Where is that vehicle located?

1          A.   I know where it was located when I
2    took the picture, I don't know where it is
3    now, I haven't double-checked.  North of
4    Winnetoon, Nebraska.
5          Q.   Is it parked in the field or where
6    is it?
7          A.   In a pasture.
8          Q.   Do you know who owns the Dodge Ram
9    pickup?
10          A.   (No response.)
11          Q.   Did you find a title to the truck?
12          A.   Registration.
13          Q.   Put them together, it's back about
14    half way.
15          A.   That's not the right pickup, 2006.
16          Q.   So page 1 is a 2006 Dodge?
17          A.   Yep.
18          Q.   Did you look inside the vehicle?
19          A.   That's where the registration was.
20          Q.   And you photographed the
21    registration?
22          A.   Do you have a comment, Lauren?
23          MS. GOODMAN:  I don't, no, I'll have
24    some questions after he gets done.
25          A.   You keep sighing and stuff, I just

1    wondered if you have something you wanted to

2    say.

3              MS. GOODMAN:  No.

4         A.  Okay.

5              MS. GOODMAN:  No follow-up until

6    he's finished.

7         Q.  (Mr. Garden) Well, let's just -- you

8    looked at the registration, who did it show to

9    be the owner of the Dodge pickup?

10        A.  I'm going to try to find it.

11        Q.  May not have gathered all the

12   photographs in this Exhibit.  If you don't

13   recall, do you have your phone with you?

14        A.  Sure I do.

15        Q.  Would that assist you in recalling?

16        A.  Sure.

17        Q.  Well, why don't you take a moment

18   and look at your phone.

19        A.  It might be right here, but I'm

20   pretty sure it's not.

21        Q.  Do you want to take a break?  We've

22   been drilling -- going for two hours.

23        A.  Doesn't matter to me.

24        Q.  You let me know, sir, when you need

25   a break because I'd like to go through these

1    pictures.

2          A.  (Looking at phone.)  March 16th.

3          Q.  All right.  That's when you took the

4    picture of the pickup?

5          A.  Alden Zuhlke, Lisa Zuhlke.

6          Q.  That's what the registration shows,

7    correct?

8          A.  (Indicating).  Correct.

9              MS. GOODMAN:  It says 2025?

10         Q.  (Mr. Garden) March 16th of 2025,

11   sir?

12         A.  We already went through that and he

13   asked if it was this year, yes.

14             MS. GOODMAN:  Thank you.

15         Q.  (Mr. Garden) Do you know whose land

16   this pickup was situated on?

17         A.  I don't know whose land it is, but

18   it's called the homestead.

19         Q.  Do you know who owns the homestead?

20         A.  I didn't look it up in the Court

21   records, but it's a Zuhlke, probably not

22   related to them as far as the immediate

23   family, meaning the boys or Lisa and Al.

24         Q.  So, turning to page 2 of Exhibit 25.

25         A.  (Witness so doing.)

1      Q.  You took this photograph, didn't
2  you?
3      A.  Yes.
4      Q.  When?
5      A.  Same date.  Did I say March 8th?
6      Q.  I think you said 16.
7      A.  March 16th.
8      Q.  All right.  What does the photo
9  depict?
10     A.  A couple of -- one attachment for a
11  skid steer and it looks like a 3-point small
12  disc.
13     Q.  And is that in the -- there's a
14  truck in the rear, is that the same --
15     A.  Same one.
16     Q.  All right.  As page 1?
17     A.  (Witness nodding head yes.)
18     Q.  So, this is all, again, on the
19  homestead, correct?
20     A.  Correct.
21     Q.  Page 3, when did you take that
22  photograph?
23     A.  March 16th.
24     Q.  What is it?
25     A.  What is it, a camper.

1          Q.  Okay.  Where was this camper
2     located?
3          A.  Same place, the homestead up on top
4     of a hill about a quarter mile away.
5          Q.  And page 4, is that the VIN for the
6     camper?
7          A.  Yep.
8          Q.  And you took that photograph, too,
9     didn't you?
10         A.  Yep.
11         Q.  Page 5, what does that show us?
12         A.  A license plate on a pickup.
13         Q.  Taken March 16?
14         A.  Nope.
15         Q.  Oh, when did you -- did you take the
16    photograph?
17         A.  Yep.
18         Q.  When?
19         A.  March 9th.
20         Q.  Of '25?
21         A.  Yes.
22         Q.  Where is this vehicle located?
23         A.  Piece of property south and west of
24    Creighton.
25         Q.  Do you know who owns it?

```
1          A.  They call it the Blair property.  I
2     don't know who owns it.
3          Q.  Do you know who owns the vehicle
4     depicted in the photograph?
5          A.  No, but it's in my records over
6     there (indicating), you can run the plate.
7          Q.  Next page is an International truck.
8     Did you take that photograph?
9          A.  Yep.
10         Q.  When did you take that?
11         A.  It would help if I was going the
12    right dang direction.  March 18th.
13         Q.  Where -- of '25?
14         A.  Correct.
15         Q.  Where was this vehicle located?
16         A.  It was what they called the Zuhlkes'
17    original home place where Lisa and Al lived.
18    It got sold by the bank to Tim Braun.
19         Q.  So this is on land that Mr. Braun
20    owns?
21         A.  There's a question -- I would say
22    yes, but nobody knows who owns the stuff.
23         Q.  Did you look at the registration for
24    this International?
25         A.  One of them I did, 1983
```

1    International S Series, Diamond Z Farms.

2         Q.   So, Diamond Z is an entity that Al

3    and Lisa have an interest; isn't that correct?

4         A.   As far as I know.

5         Q.   Next page depicts a pickup, 26

6    county license 1031.

7         A.   Yep.

8         Q.   Did I skip the grain trailer?

9         A.   No.

10        Q.   Did you take that photograph?

11        A.   Yep.

12        Q.   When?

13        A.   March 18.

14        Q.   '25?

15        A.   Correct.

16        Q.   And where was this photo taken?

17        A.   Same place, where Lisa and Al used

18   to live.

19        Q.   Did you look at the registration for

20   this pickup?

21        A.   Nope.

22        Q.   In the rear or upper left there's

23   some -- looks to be either anhydrous tanks

24   or --

25        A.   Propane tanks.

1    Q.  -- propane tanks.  Do you know who

2  owns those?

3    A.  Nope.

4    Q.  And is that the -- in the upper left

5  is that the same truck that we were looking at

6  on the prior page, the International?

7    A.  No.

8    Q.  Is that the feed truck?

9    A.  It's two feed trucks.

10    Q.  All right.  Did you investigate the

11  ownership of the two feed trucks?

12    A.  Ran the license plate.

13    Q.  And what did you learn?

14    A.  I don't know what it is, it's over

15  there (indicating).  Either Diamond Z or Lisa

16  and Al Zuhlke.

17    Q.  On both feed trucks?

18    A.  Yeah.

19    Q.  The next page, did you also take

20  that photograph on March 18 of this year?

21    A.  Yep.  That shows you the second feed

22  truck's license plate.

23    Q.  The next page is a red Ford.  Do you

24  recognize that?

25    A.  Yep.

1          Q.   You took that photograph?

2          A.   Yep.

3          Q.   When?

4          A.   March 18, 2025.

5          Q.   Where was this taken?

6          A.   Where Lisa and Al used to live.

7    Same place as the other two feed trucks and

8    the pickup.

9          Q.   What kind of vehicle is this, sir?

10         A.   Straight truck.

11         Q.   Okay.  Did you look into the

12   ownership of that truck?

13         A.   Nope.

14         Q.   Next page is a photograph, it looks

15   like the rear of a feed truck; is that

16   correct?

17         A.   That's correct.

18         Q.   Did you take that photo?

19         A.   Yep.

20         Q.   When?

21         A.   March 9th.

22         Q.   And where was this photograph taken?

23         A.   South and west of Creighton.

24         Q.   Do you know who owns the land

25   that --

1          A.   No, they call it the Blair property.

2          Q.   Who's 'they'?

3          A.   The surname people say it's the

4     Blair property.

5          Q.   So just in this neck of the woods

6     we'd refer to that as the Blair property?

7          A.   Maybe the Zuhlkes refer to it as the

8     Blair property, I don't know.

9          Q.   Did you investigate the ownership of

10    this truck having license 26 county 223R?

11         A.   Just ran the plates.

12         Q.   And what did you learn?

13         A.   Diamond Z Farms.

14         Q.   Next page is a registration, did you

15    take a photograph of that?

16         A.   Yep.

17         Q.   When?

18         A.   March 9th, I think.  You got them

19    out of -- you got them out of series here, so

20    I'm not darn sure, but that one -- I got to

21    re-say that.  That was March 18th.

22         Q.   All right.  And that's to the white

23    International; is that correct?

24         A.   Yep.

25         Q.   Next page is another registration,

1    did you take that photograph?

2           A.  Yep.

3           Q.  When?

4           A.  I'm pretty sure it's March 9th, but

5    I'll double check.  March 9th.

6           Q.  Next page is -- did you take the

7    photograph of the trailer?

8           A.  Yes.

9           Q.  When?

10          A.  March 9th.

11          Q.  Where was that located?

12          A.  South and west of Creighton.

13          Q.  What do we call that property?

14          A.  Blair property.

15          Q.  Thank you.  Did you investigate the

16   ownership of this trailer?

17          A.  Couldn't read the license plate, no.

18          Q.  Next page is a trailer with the 26

19   county X3464 plate.  Did you take that photo?

20          A.  Yes.

21          Q.  When?

22          A.  March 8th.

23          Q.  Where was this taken?

24          A.  South and west of Creighton.

25          Q.  Is that the Blair property again?

```
 1              A.  Yes.
 2              Q.  Does somebody live on this Blair
 3      property?
 4              A.  Not that I know of, pigs and coons.
 5              Q.  Is it secluded?
 6              A.  Not really.
 7              Q.  Any buildings on it?
 8              A.  Sure.
 9              Q.  Farmstead and --
10              A.  Farmstead, but no house I know of.
11              Q.  Okay, just outbuildings?
12              A.  Pig barn, open front pig barn, shop,
13      couple garages.
14              Q.  And I may have asked you, but who
15      owns the Blair property?
16              A.  I don't know, I didn't look it up.
17              Q.  Okay.  So, next page, did you take
18      that photograph?  It looks like a snowblower?
19              A.  Yeah.
20              Q.  When?
21              A.  Don't know, I must have erased it.
22      I don't know, but it was probably, maybe
23      March 20th.  I may have it, I may not.
24              Q.  Where was this photo taken?
25              A.  Plainview, Nebraska.
```

1        Q.  It looks to be inside of a building.

2        A.  Inside of an old barn.

3        Q.  Do you know who owns the property in

4   which that barn sits?

5        A.  Yes, I provided it to you.  Lisa and

6   Alden Zuhlke in Pierce County.

7        Q.  Lisa and Alden own this barn?

8        A.  Own the barn and the lot that it

9   sits on.  And I lied to you, I provided it to

10  Ron Temple quite awhile ago, he was supposed

11  to give it to you guys.

12       Q.  Okay.  So, they own some real estate

13  in Pierce County?

14       A.  Yes.

15       Q.  About how many acres was it?

16       A.  I got to back up, that's March 15th.

17       Q.  I'm sorry.  About how many acres?

18       A.  It's just a lot, or two lots, or

19  whatever.  Whatever the register of deeds

20  says.

21       Q.  Okay.  So these are, what, like, an

22  acre lot, a city lot?

23       A.  It looks to be at least a half a lot

24  -- half a block or a whole block, or I guess a

25  half a block, maybe.  It's a wide open deal

1    with a barn on it.

2         Q.   Okay.   And you entered the barn and

3    found the snowblower, correct?

4         A.   The reason I went up there is

5    because we had identified this place as

6    something that they owned and gave it to my

7    attorney, he was supposed to forward it to you

8    and somebody said I wonder what else is in the

9    barn, I have no idea.  My sister had been

10   mowing my mom's lawn last summer, and I have a

11   friend that lives right north of my mom -- and

12   my mom has a lawnmower that I gave to her, my

13   mom has another big diesel lawnmower that was

14   her -- my youngest brother's, never used it.

15   And my sister started mowing the lawn and a

16   friend goes, 'Your sister drives by here with

17   a John Deere lawnmower to mow your mom's lawn

18   in town.'  I'm going where the hell is that?

19   Went up there and the lawnmower is in this

20   barn.  Drives it all the way across town to

21   mow my mom's lawn.

22        Q.   The sister being Lisa Zuhlke?

23        A.   Yep.

24        Q.   All right.

25        A.   So, and I was looking at the

1   lawnmower I see the snowblower.

2         Q.  Did you take a photograph of the

3   lawnmower?

4         A.  Yep.

5         Q.  Oh.  So, we'll get to that.

6         A.  March 15th, same place, Plainview.

7         Q.  Other than --

8         A.  Inside of a barn.

9         Q.  Other than the lawnmower and the

10  snowblower, was there anything else of value

11  in the barn?

12         MS. GOODMAN:  Objection, form and

13  foundation.

14         Q.  (Mr. Garden) Did you see anything

15  else of value in this barn?

16         MS. GOODMAN:  Same objection.

17         Q.  (Mr. Garden) You can go ahead and

18  answer.

19         A.  Can I be a smart aleck?

20         Q.  Sure.

21         A.  Depends on whether or not you like

22  to collect old school desks and old bales of

23  straw, the answer is no.

24         Q.  Okay, appreciate that.  Would you

25  turn to the next page, identify it.

1          A.   (Witness so doing.)   It's an

2    attachment for a skid steer with a skid steer

3    in the background with another attachment

4    beside it.

5          Q.   Did you take this photograph?

6          A.   Yep.

7          Q.   When?

8          A.   I should start making a note here.

9    March 9th.

10         Q.   Of '25?

11         A.   Yes.

12         Q.   Where was the photograph taken?

13         A.   South and west of Creighton.

14         Q.   Do you know who owns the land?

15         A.   Nope.   It's called the Blair

16   property.

17         Q.   Okay.   So this is -- this Blair

18   property, there's been a lot of equipment that

19   you photographed there, isn't there?

20         A.   Yes.

21         Q.   And vehicles?

22         A.   Yes.

23         Q.   Next page, could you identify that

24   for me?

25         A.   Basically the serial number plate of

1    that skid steer.

2          Q.   And you took that photograph the

3    same day?

4          A.   Yep.

5          Q.   The next page, could you identify

6    that?

7          A.   Attachment for a skid steer.  Same

8    property, same date, March 8th.

9          Q.   Next page, would you identify that?

10         A.   Serial number of another you

11   necessarily wouldn't call it a skid steer, but

12   utility material handling piece of equipment.

13         Q.   Was this tracked or wheeled?

14         A.   Wheeled.

15         Q.   When did you take that photograph?

16         A.   March 8th, same property.

17         Q.   Next page, would you identify that?

18         A.   Skid steer bucket, same date, same

19   property.

20         Q.   And, again, you took that

21   photograph?

22         A.   Correct.

23         Q.   Next page, would you identify that?

24         A.   Basically it's a 260 Eco JCB skid

25   steer, same date, same property.

1    Q.  Next page, would you identify that?

2    A.  It's a serial number either for that

3 skid steer or the other one, same date, same

4 property.

5    Q.  And the next page?

6    A.  That's the other skid steer,

7 telehandler, whatever you want to call it,

8 same date, same property.

9    Q.  Then we get to the lawnmower.

10   A.  Plainview, in a barn on real estate

11 that's registered in Pierce County to Lisa and

12 Al Zuhlke.

13   Q.  And then the next page is a

14 duplicate of the snowblower, isn't it?

15   A.  Yep.

16   Q.  All right.  The next page, what is

17 that a photograph of?

18   A.  It's the power plant or the engine

19 of a jetter.

20   Q.  Of a what?

21   A.  Jetter.

22   Q.  What's a --

23   A.  J-e-t-t-e-r.

24   Q.  What does a jetter do?

25   A.  Jets out sewer lines with high

1   pressure water.

2          Q.   Did you take the photograph?

3          A.   Yes.

4          Q.   Where?

5          A.   South and west of Creighton.

6          Q.   Is that the Braun?

7          A.   Blair.

8               MS. GOODMAN:  Blair.

9          Q.   (Mr. Garden) Or Blair, I'm sorry.

10  When did you --

11         A.   March 9th.

12         Q.   Was this in a building or sitting

13  out in the open?

14         A.   In a building.

15         Q.   Would you identify the next

16  photograph?

17         A.   It looks like used stainless steel

18  hog feeders.

19         Q.   Did you take the photo?

20         A.   Yep.

21         Q.   When?

22         A.   March 18th.

23         Q.   And where did you find these hog

24  feeders?

25         A.   Where Lisa and Al used to live.

1          Q.  That's Tim Braun's place?

2          A.  (Witness nodding head yes.)  Yes.

3          Q.  All right.  Next page, I'm curious?

4          A.  I just thought you needed a giggle.

5          Q.  Well, I thought it was a beautiful

6     calf.  Was this our calf?

7          A.  Just pulled it.

8          Q.  All right.

9          A.  That's my son-in-law.

10         Q.  Which one?

11         A.  The only one, Nick Penlicker.

12         Q.  All right.

13         A.  Remember that name of that daughter

14    Morgan?

15         Q.  Yes.  Well, I like your sense of

16    humor.  All right, next page looks like

17    propane tanks, correct?

18         A.  Correct.

19         Q.  When was this taken?

20         A.  March 18th.

21         Q.  And, again, you took it?

22         A.  Yep.

23         Q.  Where?

24         A.  Lisa and Al's old place, Tim Braun

25    owns it now.

```
 1          Q.   Next photograph, did you take that?

 2          A.   Yep.

 3          Q.   When?

 4          A.   March 18th.

 5          Q.   Where?

 6          A.   Lisa and Al's old place.

 7          Q.   And what does that show us?

 8          A.   Two storage tanks.

 9          Q.   Are these sitting on a concrete slab

10     or --

11          A.   I didn't look.

12          Q.   Okay.  And the final photograph, did

13     you take it?

14          A.   Yep.

15          Q.   When?

16          A.   March 18th.

17          Q.   Where?

18          A.   Lisa and Al's.

19          Q.   I think we've got -- I've got one

20     more exhibit.  Sir, did Mr. Temple ever share

21     the e-mail that we've marked as Exhibit 26

22     with you?

23          A.   Yes.

24          Q.   Are you familiar with Exhibit 26?

25          A.   Yes.
```

1          Q.  And I'm kind of curious, it's an

2     e-mail that Mr. Temple sent to the trustee,

3     isn't that correct, to Mr. Kelly?

4          A.  Sent it to Phil Kelly.

5          Q.  All right.  And there's some

6     discussion of further investigation Rabo

7     should have done regarding the disappearance

8     of its collateral, what do you know about

9     that?

10          A.  What I know about it is hardly

11     anything that I produced right here, but I

12     knew there was something (indicating),

13     property, equipment, that the Sheriff did not

14     confiscate, whatever, that he was required to

15     do.

16          Q.  And the Sheriff you're talking about

17     is Sheriff Moore?

18          A.  That's correct.

19          Q.  Have you had conversations with

20     Sheriff Moore about his efforts to recover

21     Rabo's collateral?

22          A.  Yes.

23          Q.  When?

24          A.  You have the information.  Probably

25     two weeks ago --

```
1          Q.  All right.
2          A.  -- was the last time in person with
3    -- in the Sheriff's office with his Deputy,
4    and in text messages when I texted you I
5    hadn't heard anything from Sheriff Moore.  And
6    prior to that I was in another lawsuit with
7    John Deere concerning a tractor that my
8    brother-in-law had bought out of state.
9          Q.  What brother-in-law?
10         A.  Scott Clark.
11         Q.  All right.
12         A.  But I got drug into the lawsuit
13   because the tractor, that I had nothing to do
14   with, was sitting on his place, which is owned
15   by Sunshine Ranch, so they named Sunshine
16   Ranch.  So, I got served by Robert Moore about
17   8:30 at night, with his brother out in the
18   country, of this lawsuit and we discussed Lisa
19   and Al's deal then and he said this has went
20   on way too long and the Judge is not happy.
21         Q.  About when did that conversation
22   occur?
23         A.  Probably in August.
24         Q.  Of?
25         A.  2024.  But I could look it up
```

1    because he served me.

2         Q.  All right.  What Judge was unhappy?

3         A.  I have no idea.

4         Q.  You've attempted to get the Sheriff

5    to go pick up the items that you photographed,

6    didn't you?

7         A.  I showed him some of the pictures,

8    he said he didn't want them.  He said that he

9    would like to take me and he would take the

10   photographs himself, but he said he would like

11   to have an order from the Court before he did

12   anything.

13        Q.  All right.  Did he tell you which

14   Court?

15        A.  Nope.

16        Q.  Have you had conversations with Rabo

17   or Trustee Kelly concerning purchasing Lisa's

18   stock in Sunshine?

19        A.  Yes, and it says it right here

20   (indicating).

21        Q.  All right.  Do you recall did the

22   trustee ask 2.9 million dollars for Lisa's

23   stock?

24        A.  This is what I recall, it might be

25   round numbers.

1          Q.  All right.  Tell me what you
2     remember.
3          A.  Do you want to be out of here by 1
4     or 12?
5          Q.  Just tell me what you remember.
6          A.  Before the last sheriff's sale when
7     you were there at the sheriff's sale in
8     Antelope County and you sold two pieces of
9     property I went to my bank and applied for a
10    loan for 4 million dollars.
11         Q.  And that would be Farm Credit?
12         A.  Farm Credit, Kirk Koinzan.
13         Q.  All right.
14         A.  The day before the sale they
15    approved my loan, took a thousand acres of my
16    farm ground as collateral.  I thought maybe
17    before the sale we can get this thing slowed
18    down or stopped.  The people that bought the
19    place, one of them said we're going to be
20    bidding tomorrow and I'm going, I guess I'm
21    going to go see if that's true, so I went, you
22    saw me there.  They wrote out a check,
23    $711,000 was sold that day.  I go, okay.
24    Before this they wanted 3.5, 3.9 million,
25    whatever the number was, but we thought the

1    thing should be somewhere around 2.8 million

2    after the sale, which is probably 3.5 minus

3    700,011, and they came back with a higher

4    number, 3.9 million.

5         Q.  That was through Mr. Temple?

6         A.  Through Mr. Temple.

7         Q.  All right.

8         A.  And I decided that I was going to

9    put my application for the loan on hold, which

10   the banker said there would be a fee, but he

11   said he would keep it live for awhile, and I

12   decided I'd go at this deal at a different way

13   and try to buy out Lisa's shares.

14        Q.  All right.

15        A.  And so I made an offer for the

16   shares and that's what you see the second

17   offer there, I think it may have started out

18   at 1.5, I don't know.

19        Q.  So, a long story short, you offered

20   to pay the trustee 1.7 million dollars for

21   Lisa's shares in Sunshine; is that correct?

22        A.  Yes.

23        Q.  Has that offer been withdrawn?

24        A.  Yes.

25        Q.  Why?

A.   The short story is I can't save this
deal.  The real short story is the threat that
I was given, and I can call it a threat, you
can call it whatever you want, early on was we
found out Lisa has 11 percent of Sunshine
Ranch, we think the value is somewhere over
18 million dollars in real estate and we have
investors that will buy corporations, LLCs,
and minority shares in corporations and LLCs.
We're going to demand the shares, the
certificates, and the book, and we're going to
look to sell it.  And I'm thinking, God, I
really didn't want that.  And so I said to Ron
Temple, my attorney, I said, 'Let them have
it.  Give it to them.'  'What?'  I said, 'I'm
going to call their bluff.'  He said, 'What if
Pat Meuret buys it?', and it just floored me.

Pat Meuret is a guy I sell a lot of
corn to, a lot of beans to, owns Meuret Grain
in Brunswick, grinds a lot of feed for me for
ACP, and I'm thinking where did that come
from, and so we started trying to make offers.
But the reason it's withdrawn is because I
can't save this deal and I knew from the
beginning minority shares on a closely held

corporation, find some son of a gun that wants
it and is going to put up with me and sell it
to him.

Q.  So, you withdrew the offer because
you could not save Alden and Lisa; is that
correct?

MS. GOODMAN:  Objection, form.

A.  When I said I couldn't save them,
that's exactly who I meant, Alden and Lisa.

Q.  (Mr. Garden) All right.  Have you
had any further discussions with either Rabo
or the trustee about buying Lisa's stock?

A.  No, just that I'm not going to -- no
and yes.  This still holds, there's no offer
on the table and there's not going to be one.

Q.  So, it's your position that Sunshine
Ranch will not redeem Alden -- or excuse me,
Lisa's stock in the company?

A.  Unless somebody pulls some rabbit
out of their hat and proves that I'm guilty of
something and wants to throw my ass in jail if
I don't do something.  Now, if you can sense a
little bit of rub there, yeah, they used that
in John Lentz's deal, there's a rub between me
and my sister.  This looks like a rub to me in

1   a $13,000 court fee from Ron Temple so far,

2   that's a rub to me (indicating to stack of

3   exhibits).

4      Q.  So to summarize, you're angry at

5   your sister; is that correct?

6      A.  I'm not angry, I'm angry with this

7   situation, and I'm disappointed that they

8   weren't honest in disclosing it right out of

9   the gate.  Disappointed that even with my

10   multiple tries to have a family meeting, my

11   multiple tries to say what is your plan,

12   (indicating with hands in the air) there is no

13   plan, no court dates, don't show up, don't do

14   nothing, just whatever.

15      Q.  Now, you just said your multiple

16   attempts to have a family meeting?

17      A.  (Witness nodding head yes.)

18      Q.  Who have you asked to attend a

19   family meeting?

20      A.  Ron Temple early on called for a

21   family meeting, nobody wanted to participate.

22      Q.  Who did Ron Temple ask to attend the

23   family meeting?

24      A.  Ron Temple asked the attorneys for

25   Derek and Dillan, Ron Temple asked the

1    attorneys for Darin, Ron Temple asked if Lisa

2    and Al had an attorney at that time, if that

3    was Stover.

4         Q.  It's your understanding that none of

5    the other family members wanted to attend?

6         A.  Through their counsel, no.

7         Q.  All right.

8         A.  And that is documented.

9         Q.  What do you know about the sale by

10   Alden and Lisa of farm ground to Derek and

11   Dillan Zuhlke?

12        MS. GOODMAN:  Objection, foundation.

13        Q.  (Mr. Garden) I'm asking a

14   foundational question, you can answer.

15        A.  All I knew about it was after this

16   came to light and, I guess, I'm supposed to be

17   honest here, people don't like honesty, but

18   I'm going to be honest.

19        Q.  Yes, sir.

20        A.  I basically knew nothing about it

21   until I had seen you on Zoom at that court

22   appearance where I stayed there all day

23   waiting to see Ryan Stover, and I went down

24   and met with Ron Temple and Ron Temple said

25   you know, there's avoidable -- and I don't

1    know whether it's avoidable or avoidable,

2    transfer deal that is pending here and -- if

3    you don't want me to continue I won't

4    continue.

5              MS. GOODMAN:  No, no, no.

6         Q.  (Mr. Garden) You can continue.

7              MS. GOODMAN:  I'm just listening.

8         A.  He said that, 'Most of the time Dick

9    Garden knows what he's doing and he probably

10   has a case.'  And he went on to say, 'Doug,

11   with that 4 million if you can get this

12   done -- we can get this done, we could buy

13   that case and I'll fight it for 40 percent.'

14   And I said, 'Would you do it for 20?', and he

15   said, 'No.'  And in my mind I thought you're

16   smoking something, this big and you want me to

17   go on.  If Rabo has been fighting this thing

18   this long why do I even want to think about

19   it?

20        Q.  (Mr. Garden) So, is it safe to say

21   the conversation that you and Mr. Temple had

22   was you would buy the voidable transactions

23   claim and he would then represent you in that

24   claim?

25        A.  Him and his firm, probably.

1          Q.  All right.  And you would pay

2     4 million dollars to the trustee?

3          A.  Didn't have a number yet, just

4     trying to -- that's when his documents show

5     what is the number, what is the number?  And

6     then we thought the number would go down and

7     the number went back up.

8          Q.  I'm going to focus on the transfer

9     of land to Derek and Dillan by Alden and Lisa

10    Zuhlke.  So, did Alden and Lisa ever tell you

11    that they were going to sell their land to

12    Derek and Dillan?

13          MS. GOODMAN:  Objection, form.

14          A.  No.

15          Q.  (Mr. Garden) And that's something

16    you learned after the fact?

17          A.  Yes.

18          Q.  Did Alden consult you on business

19    deals ever on his business?

20          MS. GOODMAN:  Objection, form.

21          A.  Maybe 20 years ago.

22          Q.  (Mr. Garden) Okay.  But not

23    recently?

24          A.  No.

25          Q.  So, as we sit here today, there are

1    no negotiations between you and the trustee to

2    redeem Lisa's stock; is that correct?

3              MS. GOODMAN:  Objection to form.

4    When you say 'you', do you mean Sunshine Ranch

5    or Mr. Hall personally?

6              Q.  (Mr. Garden) Okay.  Either you,

7    Mr. Hall, or Sunshine Ranch to -- strike that.

8              As of April 16, 2025, has Mr. Hall

9    offered to redeem Lisa's stock from the

10   trustee?

11             A.  No.

12             Q.  As of April 16, 2025, has Sunshine

13   Ranch made a pending offer to purchase Lisa's

14   stock from the trustee?

15             A.  No.

16             Q.  What do you know about an entity

17   Swine 84?

18             A.  I know where it's located.  I know

19   some of the other partners in it.  I know

20   supposedly what people say the worth is.  I

21   have talked to one of the other partners, last

22   name is Kuhlman.  Starting this summer he said

23   we have nothing to worry about, we got a

24   bulletproof contract.  In a few months, since

25   Alden, Diamond Z, somebody is not taking pigs

1    out of there, we have a deal where they get

2    less and less ownership as they don't take

3    pigs.  And probably talked to him one more

4    time and I said you know, I'm not so sure that

5    you're safe.  And then I showed him the

6    subpoena that I got for my records and he said

7    they had got nothing.  And then, quite

8    frankly, um, some of this stuff should be off

9    the record, but --

10        Q.  No.

11        A.  But everybody wants it on the

12   record.  I have the same veterinarian that

13   went to the Swine 84 meeting about two weeks

14   ago and his comment was, 'Man, Al has aged, I

15   about didn't recognize him.'

16        Q.  So, this Kuhlman, is that a man or a

17   woman?

18        A.  The mom wears the pants, as I

19   understand.

20        Q.  Is that Janice?

21        A.  Yeah, and the son kind of runs the

22   deal.  I guess the mom lives in Norfolk.  I've

23   never met her.

24        Q.  What's the son's first name?

25        A.  I can't even say it right now.

1        Q.  Okay.

2        A.  I want to say Brian, I want to

3   say -- I can't say it.

4        Q.  Where does the son Kuhlman live, do

5   you know?

6        A.  East of Creighton as far as I know.

7        Q.  All right.  Do you know anything

8   about an entity Z Brothers, LLC?

9        A.  Yes.

10       Q.  What do you know?

11       A.  They own a quarter of ground,

12  supposedly, that was in Herb Zuhlke's Estate

13  the three brothers bought.

14       Q.  Herb would be Alden's father?

15       A.  That's correct.

16       Q.  And that Alden and two of his

17  brothers, David and --

18       A.  Dean.

19       Q.  -- Dean purchased?

20       A.  As far as I know.

21       Q.  Okay.  Do you know who farms the

22  ground owned by Z Brothers?

23       A.  Supposedly Derek Zuhlke.

24       Q.  Are you familiar with an entity

25  called Northview, Inc.?

```
 1              A.  I am not.
 2              Q.  Are you familiar with a company
 3    called Joy Springs Properties?
 4              A.  I've heard of it, researched it a
 5    little bit.
 6              Q.  What did you learn about Joy
 7    Springs?
 8              A.  It looks like it's a complicated --
 9    in and out, I have no idea what. . .
10              Q.  You don't have any firsthand
11    knowledge?
12              A.  (Witness shaking head no.)
13              Q.  Is that correct?
14              A.  That is correct.
15              Q.  Do you know anything about loans
16    that Alden and Lisa Zuhlke made to Darin
17    Zuhlke?
18              A.  Just what I read in the public
19    notices.
20              Q.  And that would include the
21    Bankruptcy Court file?
22              A.  That's true.
23              MR. GARDEN:  I think it's time for a
24    break.
25              MS. GOODMAN:  Oh, gosh I do, too.
```

1          MR. GARDEN:  All right.

2          MS. GOODMAN:  I'm going to have a

3    fair amount of questions, so. . .

4          MR. GARDEN:  Do you want to break

5    for lunch?

6          MS. GOODMAN:  That's what I'm kind

7    of thinking.

8          MR. GARDEN:  Phil, is that okay with

9    you?  I know it's only 11 out there.

10          MR. KELLY:  Tell me when we're going

11    to start.

12          (An off-the-record discussion was

13          held.)

14          (Lunch break was taken.)

15          (Exhibits No. 27 and 28 were

16          marked.)

17          **EXAMINATION BY MS. GOODMAN**

18          Q.  All right.  Mr. Hall, my name is

19    Lauren Goodman, I represent Dillan and Derek

20    Zuhlke and their spouses in connection with a

21    litigation that has been filed by Trustee

22    Kelly.  A couple questions, just to back up

23    here.  Number one, is Sunshine Ranch currently

24    represented by an attorney?

25          A.  No.

1      Q.  Are you personally represented by an

2  attorney?

3      A.  No.

4      Q.  Okay.  How old are you?

5      A.  Um, born in 3/31/61.

6      Q.  So you just had a birthday, okay.

7      A.  Had a birthday not too long ago.

8  Old enough to retire.

9      Q.  Okay.  You personally -- I just want

10  to understand, so you indicated or testified

11  earlier you have a 16 percent ownership

12  interest in Sunshine Ranch, correct?

13      A.  Correct.

14      Q.  Do you also have personal assets

15  that you farm?

16      A.  Sure.

17      Q.  Okay.

18      A.  Yes.

19      Q.  Can you tell me about some of the

20  other business interests that you have

21  personally?

22      A.  I farm.

23      Q.  Okay.  Through an entity or just as

24  a --

25      A.  We talked about Tractor Ranch that

1    is owned by me and my wife.

2        Q.   Okay.   Other than Tractor Ranch, is

3    there anything else, any other businesses that

4    you own?

5        A.   My businesses, we farm under me and

6    my wife's name.

7        Q.   Okay.   How many total acres do you

8    own personally, not through Tractor Ranch just

9    you and your wife personally?

10       A.   Somewhere around 3,000.

11       Q.   Okay.   And then how many acres does

12   Tractor Ranch own?

13       A.   None.

14       Q.   Okay.   In addition to farming the

15   ground, do you personally own livestock?

16       A.   My wife has a herd of longhorn cows.

17       Q.   How many head?

18       A.   50.

19       Q.   All right.   Now I want to jump over

20   to Sunshine Ranch.   Does Sunshine Ranch own --

21   directly own livestock?

22       A.   No.

23       Q.   So -- okay.   With regard to Sunshine

24   Ranch, what are its primary sources of

25   revenue?

1          A.   Farming.

2          Q.   Anything else?

3          A.   Hogs, if they make money.

4          Q.   And do I understand it correctly

5     from your testimony this morning that the hogs

6     are owned by ACP?

7          A.   The hogs are under a company that is

8     titled ACP, LLC and jointly owned by Sunshine

9     Ranch, Doug Hall.

10         Q.   Okay.  With regard to the farming of

11    Sunshine Ranch does the -- does Sunshine Ranch

12    actually farm the land or does it rent it out

13    to farmers?

14         A.   Farm it.  There's a little bit that

15    my son-in-law and daughter are farming now in

16    joint with a neighbor just to get them

17    started.

18         Q.   Okay.  So, of the acres that you

19    testified Sunshine Ranch owned, how much --

20    how many of those acres does Sunshine Ranch

21    directly farm?

22         A.   All of it, probably but about 60.

23         Q.   All but 60?

24         A.   Yeah.

25         Q.   And then those 60 acres, your kids

1    or some neighbors farm?

2         A.  Yep.

3         Q.  And do those -- do your kids and the

4    neighbors, do they pay rent to Sunshine Ranch?

5         A.  Yes.

6         Q.  And is the rent under a written

7    lease?

8         A.  No.

9         Q.  What are the terms of the rent that

10   they pay to farm the 60 acres?

11        A.  So much an acre paid in the fall.

12        Q.  And when you say 'paid in the fall',

13   is that after harvest?

14        A.  Yes.

15        Q.  Okay.  And what are the -- how much

16   -- when you say so much an acre, specifically

17   how much an acre?

18        A.  Depends on the year and what we

19   agree to verbally.  250, 300, depends if it's

20   dryland or irrigated, most of this is dryland.

21        Q.  So, the 200 -- and I apologize, I

22   didn't grow up farming, 250, 300 is that

23   bushels?

24        A.  Dollars.

25        Q.  Dollars, okay, so it's cash rent?

1          A.  Yes.

2          Q.  And it's paid in full, all right.

3    Okay.  When was the last time Sunshine Ranch

4    held a shareholder meeting?

5          A.  I don't know, a long time.

6          Q.  This morning Mr. Garden showed you

7    Exhibit -- showed you -- showed you a document

8    marked as Exhibit 6 called Director Minutes.

9    Let me hand that to you.  Is that -- if you

10   look through there there's meeting minutes --

11   if you would take a look there's some meeting

12   minutes from it looks like the last meeting

13   was held in the early '90s?

14         A.  I believe that.

15         Q.  Okay.  At any point in time, sir,

16   did you personally attend a shareholder

17   meeting with regard to Sunshine Ranch?

18         A.  Sure.

19         Q.  And your recollection is the last

20   meeting you would have attended was early '90s

21   you say?

22         A.  Yes.

23         Q.  Who was at the meeting, the last

24   meeting that you attended?

25         A.  It's a closely held family

```
1    corporation, the meeting would have been me

2    and my dad.

3         Q.  Okay.  No other shareholders were

4    present for that meeting?

5         A.  No.

6         Q.  Do you recall ever being at a

7    shareholders meeting, so 1990, before, where

8    Kevin Hall attended?

9         A.  No.

10        Q.  Lisa Zuhlke?

11        A.  No.

12        Q.  Kimberly Clark?

13        A.  No.

14        Q.  Okay.  So, to your knowledge

15   Kimberly, Kevin, and Lisa never attended a

16   shareholders' meeting with regard to Sunshine

17   Ranch?

18        A.  That's correct.

19        Q.  Since 2020 have you as president

20   ever asked that a shareholders' meeting take

21   place?

22        A.  No.

23        Q.  How come?

24        A.  You know, I'm busy farming.  And I

25   know that it's required.  Sometimes don't keep
```

1    this stuff up because it's basically a piece

2    of paper you sign and it really means nothing

3    except it goes in this file so somebody can

4    look at it later.  And if you got the

5    president, and secretary, treasurer, they sign

6    the form, say we approve everything that's

7    been decided and business is going to be

8    operated and sign it and quit.  It doesn't get

9    much work done, but I know that's not what you

10   want to hear or what you want to argue about.

11          Q.  At any point in time since you've

12   been president, Mr. Hall, have you ever

13   circulated the financial statements of

14   Sunshine Ranch to any shareholders?

15          A.  No.

16          Q.  At any point in time --

17          A.  Except my dad, he has access to all

18   of it.

19          Q.  And we'll get to him in a second.

20   But since the time that you've been president

21   in the early -- since the early '90s, have you

22   ever provided a copy of a tax return to any

23   shareholders?

24          A.  No.

25          Q.  Since the early '90s when you became

1    president, have you ever -- has any of the

2    other shareholders other than your dad, so I'm

3    referring to Kevin, Lisa, Kimberly, have they

4    ever participated at all in the operations of

5    Sunshine Ranch?

6            A.   Since the early '90s?

7            Q.   Uh-huh.

8            A.   My brother left in 1991, before that

9    around when he wasn't in college.  My sister

10   hasn't helped since sometime in the '80s.  My

11   sister, Kim, did the books for a little bit

12   maybe in the early '80s, but she has her own

13   family and her own farming business, she

14   doesn't -- hasn't done anything with that.  We

15   might trade help back and forth a little bit,

16   but hardly any of that anymore.

17           Q.   Have you ever invited any of the

18   other shareholders to assist in the operations

19   of Sunshine Ranch since the early '90s when

20   you became president?

21           A.   Invited them to participate in what?

22           Q.   The operations of Sunshine Ranch.

23           A.   Well, I guess depends on what you

24   want to say.  There was a farm that came up

25   for sale and I asked my son-in-law if he

1   wanted to maybe buy it and he said, geez, at

2   900 dollars an acre for irrigated acres, I

3   would have to pay this much interest and he

4   didn't haven't the money and he said no,

5   um. . .

6        Q.  And to be clear, is your son-in-law

7   a shareholder in Sunshine Ranch?

8        A.  My son-in-law, no.

9        Q.  Okay.

10       A.  I was talking about my

11  brother-in-law.

12       Q.  Oh, your brother, okay, I'm sorry.

13       A.  You were talking about shareholders.

14       Q.  Yeah, you said son-in-law, so I

15  apologize.

16       A.  Sorry.

17       Q.  That's all right.  So, okay, so is

18  it fair to say, sir, since the early 1990s

19  through the present you have been president

20  and in control of Sunshine Ranch?

21       A.  That's fair.

22       Q.  I want to talk a little about your

23  father, it's Sumner A?

24       A.  That's correct.

25       Q.  Okay.  Tell me his involvement since

1    the early '90s in Sunshine Ranch.

2         A.   Up until about two years ago we

3    worked together side-by-side every day of the

4    year.

5         Q.   Okay.  In 2008 when ACP -- the

6    operating agreement for ACP was signed,

7    correct?

8         A.   That's what it said.

9         Q.   Okay.  Is that -- was the ACP

10   transaction something that you discussed with

11   your father at the time you entered into it?

12        A.   Yes.

13        Q.   Okay.  Did you share the information

14   about ACP with any of the other shareholders?

15        A.   Quite frankly, Alden Zuhlke went

16   with me to the meeting down in Columbus in

17   Sands' office when Sands basically said we

18   need to maybe find different people to manage

19   this thing because we have filed for

20   bankruptcy under Furnas County Farms.  And

21   Alden went with me, my wife went with me, and

22   at that time they discussed the amount per

23   share and asked if anybody wanted their

24   prorated share that was in ACP Partnership,

25   they called it Antelope County Partners, and

1   -- or if they -- if all the prorated share

2   wasn't taken up, if they wanted more of their

3   prorated share, or you could check you didn't

4   want any of it, three checkmarks.  Alden was

5   right there with me, I didn't know a lot about

6   hogs, even though we'd been in this deal we

7   didn't have any control over it.  I didn't

8   like what I saw and so I took him along or

9   asked him to go along.

10       Q.  Okay.  Has Alden Zuhlke ever owed

11  any interest in ACP?

12       A.  No.

13       Q.  When you made the decision to invest

14  any -- strike that.  When Sunshine Ranch,

15  which you were president of, made the decision

16  to invest in ACP, was that decision to invest

17  discussed with the other shareholders?

18       A.  My dad.

19       Q.  Okay.  Was there any -- were there

20  any documents signed in connection with that

21  decision between your dad and Sunshine Ranch?

22       A.  Not that I'm aware of.

23       Q.  I want to ask, and we'll get back to

24  ACP in a minute here, but I want to ask with

25  regard to some questions about the stock

1  certificates of Lisa.  Did you ever -- have

2  you ever seen shares that are signed by Lisa

3  Zuhlke that have her signature on them?

4      A.  You mean stock certificates?

5      Q.  Yeah.

6      A.  I don't think so, no.

7      Q.  Okay.  So, if we could look at the

8  stock registry -- so, what's been marked as

9  Exhibit 4 is the document you've identified as

10  the stock registry and we talked -- you

11  provided some testimony today about the actual

12  certificates that are held -- were held by

13  Lisa.  I'd like to point you to a page here,

14  do you recognize that document?

15      A.  Yes.

16      Q.  Okay.  And down at the -- it says

17  here, which just for the record, Sumner A.

18  Hall is custodian for Lisa Ann Hall under the

19  Nebraska Uniform Gift Act of -- Minor Act.

20  Did I read that correctly?

21      A.  Yeah.

22      Q.  Dated January 3rd of 1966, correct?

23      A.  Yep.

24      Q.  Okay.  Do you recognize the

25  signature at the bottom of that certificate?

1        A.   Yes.

2        Q.   Okay.  And whose signature is that?

3        A.   My dad's.

4        Q.   All right.  For the record, have you

5   ever seen a certificate similar to what we're

6   looking at here concerning Sunshine Ranch that

7   has Lisa Zuhlke's name down at the bottom or

8   his signature?

9        A.   No.

10       Q.   No, okay.  Do you dispute -- because

11  I understand that we're missing some

12  certificates, correct, is that what your

13  testimony was this morning?

14       A.   I don't know where the rest of the

15  certificates are.

16       Q.   Okay.  Do you dispute that she's an

17  11 percent owner?

18       A.   No.

19       Q.   Okay.  But to your knowledge, and

20  based on your testimony this morning to

21  confirm, all the certificates that you had in

22  your possession have now been turned over to

23  the trustee, correct?

24       A.   All of her certificates.

25       Q.   All of her -- excuse me, all of her

1    certificates.

2        A.   Yes.

3        Q.   Thank you.  Okay.  With regard to

4    the ownership of Sunshine Ranch, you testified

5    this morning that you held 11 percent interest

6    and then you also testified that you purchased

7    your grandmother's 4 percent interest; is that

8    correct?

9        A.   Yeah.

10       Q.   When was that interest purchased?

11       A.   When she died in 1992.

12       Q.   Okay.  And do you know how much you

13   paid for that interest?

14       A.   I don't remember.

15       Q.   Do you think you paid something for

16   it?

17       A.   Yes, I paid something for it.

18       Q.   Would you have documents that

19   reflect the transfer of that interest to you?

20       A.   My grandma's attorney through my

21   Aunt Ellen probably has those documents.  I

22   could probably dig them up.

23       Q.   Okay.  And who's your -- who was

24   your grandmother's attorney; do you know?

25       A.   I don't remember.

1      Q.  Okay.  And you think it was in 1992?

2      A.  She died in 1992.  They screwed with

3  me for over a year wanting several years of

4  income tax, all the records.  I made an offer

5  right out of the gate for two pieces of land,

6  and some of the personal property that never

7  showed up, and the ownership of Sunshine Ranch

8  and they got through a year and they settled

9  for less than I offered.

10     Q.  Okay.  So --

11     A.  I consider it history.

12     Q.  So do I understand then, sir, so you

13 purchased not only the 5 percent interest from

14 your grandmother, but then a number of other

15 assets as well?

16     A.  No, I purchased one piece of ground

17 that was pasture, we call it grandma's

18 pasture.  Sunshine Ranch purchased a small

19 irrigated chunk of 106 acres because an REA

20 pole went through it, I didn't irrigate the

21 whole thing.  The personal property

22 disappeared with my aunt.

23     Q.  Okay.  All right.  So --

24     A.  I got one piece of property and a 5

25 percent of grandma's share.

1        Q.  Okay, for what you paid?

2        A.  Yeah.

3        Q.  Okay.  And you don't recall what you

4   paid sitting here today?

5        A.  (Witness shaking head no.)

6        Q.  Okay.  We had talked earlier about

7   the ownership in Sunshine Ranch and you had

8   indicated -- well, let me strike that.

9            Is Kevin Hall an owner of Sunshine

10  Ranch currently?

11       A.  It's in here, yes.

12       Q.  And you have no reason to dispute

13  that?

14       A.  No.

15       Q.  Okay.  You had testified earlier

16  that Lisa Zuhlke every year signed some sort

17  of FSA form with regard to her income, do you

18  recall that testimony?

19       A.  Sure.

20       Q.  Are you provided a copy of that form

21  after she signs it?

22       A.  No.

23       Q.  Okay.  So how do you know she signs

24  it?

25       A.  That's the only way you can get a

1    government payment, you have to turn that in.

2    It's the only way Sunshine Ranch would get a

3    government payment is all the people that have

4    any interest in that entity sign this form and

5    check that they make less than this amount.

6         Q.  Okay.

7         A.  That's a requirement.

8         Q.  Okay.  So, to be clear, you have no

9    personal knowledge that she's actually signed

10   it other than your understanding of the

11   government payment?

12        A.  I got the payment.

13        Q.  You got the payment.

14        A.  That the only way I could get the

15   payment.

16        Q.  Thank you.  Can we take a peek at

17   Exhibit 5?  You had testified earlier, sir,

18   that this was a -- excuse me, the minutes of

19   the first meeting of shareholders of Sunshine

20   Ranch, okay?

21        A.  Okay.

22        Q.  I just want to be clear, you were

23   not personally at this meeting, correct?

24        A.  You know what, my mom might have

25   been there and I might have been four years

1  old, I might have been there, but I don't

2  remember it.

3          Q.  Okay.  That's all I'm getting at.

4  That's all I'm getting at.  All right, let's

5  keep going here.  Let's take a look at --

6          A.  What were you doing when you was

7  four years old?  I know you're asking the

8  questions.

9          Q.  All right.  There was some property

10  that you had indicated that Sunshine Ranch

11  sold -- well, I just -- strike that.  I want

12  to be clear.

13          From 2020 to 2025 sitting here

14  today, has Sunshine Ranch sold any of its

15  property?

16          A.  That 20 acres of Coulters' to Doug

17  and Luann Hall with the okay written consent

18  through Ron Temple that they were okay with

19  the sale and the price.

20          Q.  You anticipated my next question.

21  So, the written consent, do you have a copy of

22  that?

23          A.  I probably do somewhere.

24          Q.  Okay.  And who do you understand

25  signed and consented to the sale?

1     A.  Lisa Zuhlke, Kevin Hall, Kim Clark,

2   Sumner A. Hall.

3     Q.  And can you provide me with a copy

4   of that written consent?

5     A.  I could.

6     Q.  Will you?

7     A.  I suppose if you ask the judge for

8   me to do it, and if I'm in a good mood I'll

9   probably do it without the judge.

10     Q.  Okay.  Because I think as part of

11   the subpoena that was served on you, sir, we

12   asked for the consent and all the corporate

13   documents, so I think it's covered by the

14   order.

15     A.  Okay, I'll supply it.

16     Q.  Thank you.  All right.  All right.

17   Sir, we went through -- if we could go to

18   Exhibit 10.

19     A.  I'm just looking at my text because

20   I think that one of them text me also, but

21   that is not going to -- with what you want,

22   so. . .

23     Q.  Yeah, okay, if you got it that's

24   good enough if you can just e-mail it to me.

25   All right.  We were looking at 10 and

1    Mr. Garden asked you some questions about an

2    investment in NECC; do you recall that?

3            A.   Yes.

4            Q.   Okay.  So, NECC, Nick and Morgan he

5    asked you some questions about that.  First

6    off, my question is when this real estate was

7    purchased?

8            A.   What real estate?

9            Q.   The NECC house.

10           A.   It's not real estate, it's a house.

11           Q.   Okay, I apologize.  When the house

12   was purchased.

13           A.   Yeah.

14           Q.   Okay.  Did you obtain any consent

15   from the shareholders with regard to the

16   purchase?

17           A.   No.

18           Q.   Did you inform any shareholders you

19   were making the purchase?

20           A.   No.

21           Q.   And is that true, sir, for all of

22   the other investments that are listed under

23   other non-current assets that you did not

24   inform any of the other shareholders that

25   those assets were --

1        A.   Except my dad on ACP.  I talked to

2   him about the Bowdish Soybean Plant.  Talked

3   to him about a loan that they say is to me

4   because it comes up on the income tax every

5   year and he asked a question about that.

6        Q.   Okay.  So, other than your dad, did

7   you notify any other shareholders --

8        A.   No.

9        Q.   Hang on, let me just -- sir, I know

10  you want to get out of here, I get it, let me

11  just finish my question, okay?  Did you notify

12  any other shareholders of the purchase of any

13  of the other non-current assets listed on

14  Exhibit 10?

15       A.   No.

16       Q.   All right.  With regard to this loan

17  to Doug Hall, okay, it's indicated that you

18  owe Sunshine Ranch roughly $447,000.  Do you

19  dispute that amount?

20       A.   No.

21       Q.   What are the terms by which you will

22  repay that?

23       A.   The government requires you to

24  charge at least a certain percent interest,

25  somewhere around 4 percent.

1      Q.  Okay.  Are you -- are you currently

2   making payments?

3      A.  No, I haven't.

4      Q.  When do you anticipate starting?

5      A.  As soon as I make some money.

6      Q.  Okay.  And to be clear, is that loan

7   to you documented at all in writing?

8      A.  No.  And that might not be true, it

9   might be in the income taxes, a line item

10  saying, hey -- and Bernie might have put a

11  sheet in the income tax that said, hey, this

12  is an agreement loan, whatever.

13     Q.  Okay.  Also on Exhibit 10 you had

14  provided some testimony about this note

15  receivable in the amount of about 6.2 million

16  dollars; do you recall that testimony?

17     A.  Yes.

18     Q.  This amount as I understand it is

19  owed by ACP to Sunshine Ranch, correct?

20     A.  Correct.

21     Q.  What are the terms by which this

22  amount is going to be repaid?

23     A.  Same terms as before, start making

24  some money in the pigs and pay back.

25     Q.  Has this receivable at all or loan

1    from Sunshine Ranch been documented at all in

2    writing?

3          A.  I think probably in the income tax

4    and on the line item.

5          Q.  Was the receivable -- is this

6    receivable of 6.2 million dollars, was this

7    disclosed to the shareholders of Sunshine

8    Ranch?

9          A.  No.

10         Q.  All right.  With regard to

11   Exhibit 10, I believe, and help me refresh

12   my -- there's a lot of information this

13   morning, help me refresh my memory.  How was

14   the real estate value determined on

15   Exhibit 10?

16         A.  Right here underneath the real

17   estate (indicating)?

18         Q.  Yeah.

19         A.  Well, the house was just bought

20   lately so it says real estate, and you

21   mentioned real estate earlier was just a

22   house, that's what they paid for it.

23         Q.  Okay.

24         A.  The Scott Clark deal, that's

25   probably what we paid for that piece of ground

1    when we bought it.  The Coulter building says

2    150,000, that's for 20 acres, actually paid

3    166,000 for it, dryland, irrigated, half

4    pasture.  The banker came up with his number

5    on that.

6            Q.  Okay.  And you don't know how the

7    banker came up with that number, do you?

8            A.  No, I don't.

9            Q.  Sitting here today, sir, do you have

10   an opinion as to the value of land that

11   Sunshine Ranch owns?

12           A.  Sure I do.

13           Q.  And what is that opinion?

14           A.  The opinion is it depends on the

15   day, depends on whether or not they think the

16   tariffs are going to screw things up.  Depends

17   on whether the next door neighbor wants to buy

18   a big chunk of 5,000 acres, whether or not it

19   has any cattle or cows to put in the pasture,

20   or whether or not you're just going to split

21   it off one-by-one.

22           Q.  Okay.  So, do I take it you don't

23   have an actual monetary or you can't quantify

24   your opinion of value?

25           A.  If I spent a couple hundred thousand

1    dollars, I could get two certified appraisers
2    that would satisfy you or whoever wants to
3    know, and that's still might not be the value
4    on any given day.
5         Q.  Understood.  And that's why I'm just
6    asking your opinion, I get that.  I'm just
7    asking your opinion.
8         A.  And I said no.
9         Q.  You don't have an opinion sitting
10   here today?
11        A.  (No response.)
12        Q.  Okay.  Sir, I want to ask with
13   regard to the expenses of Sunshine Ranch, are
14   all the expenses -- strike that.
15             Mr. Garden showed you some ledger
16   information, Exhibit 22 and 23.  I've handed
17   you what has been marked as Exhibit 22 and 23.
18   Do those documents contain all of the expenses
19   of Sunshine Ranch for years '22 and '23?
20        A.  As far as I know.  I don't know why
21   they wouldn't.
22        Q.  Okay.  With regard to the expenses
23   incurred by Sunshine Ranch, do any of those
24   relate to your personal farming operation?
25        A.  No.  I have my own company, Tractor

1    Ranch.

2         Q.   Okay.  So Sunshine Ranch doesn't pay

3    any amount that would otherwise --

4         A.   Sunshine Ranch --

5         Q.   That would otherwise be used for

6    your personal operation?

7         A.   Sunshine Ranch has never paid me a

8    wage.  Sunshine Ranch doesn't pay for my

9    farming.

10        Q.   All right, sir, I'd like to hand you

11   what's been marked as Exhibit 27 I set in

12   front of you.  All right, is this a copy of

13   the Sunshine Ranch tax return for 2023?

14        A.   It looks like it.

15        Q.   It indicates on here there's a line,

16   line 12, that says 'compensation of officers';

17   do you see that?

18        A.   On which page?

19             MR. GARDEN:  On which page?

20        Q.   (Ms. Goodman) On the first page,

21   line 12.

22        A.   Okay.

23        Q.   Is that what -- who was the officer

24   that's being compensated in that amount?

25        A.   I don't have any idea.

1    Q.  Okay.  But your testimony sitting

2    here today, it wasn't you?

3    A.  As far as I know it wasn't me.

4    Q.  And have you ever drawn a wage from

5    Sunshine Ranch?

6    A.  No.

7    Q.  Have you ever taken a distribution

8    from Sunshine Ranch?

9    A.  No.

10    Q.  All right.  We talked a little bit

11    this morning about ACP, and I'm trying to just

12    get a feel for it because, again, the

13    information came fast and furious.  So, at the

14    end of the day, sir, how much does Sunshine

15    Ranch end up paying for ACP for its ownership

16    interest?

17    A.  I don't know.  The number was, like,

18    42,000 -- 41,000, 42,500 a share, however many

19    shares there was.

20    Q.  How does owning ACP benefit Sunshine

21    Ranch?

22    A.  Last four years it doesn't.

23    Q.  Okay.  Is ACP currently up for sale?

24    A.  Everything is for sale, but it's not

25    listed with anybody.  I haven't advertised it

1    with anybody.

2          Q.  When you say 'everything is for

3    sale' what do you mean by that?

4          A.  The saying is everything is for sale

5    except my wife and kids, and we can negotiate

6    that.

7          Q.  Okay.  All right.  So, in other

8    words, do I understand you correctly, if

9    somebody came and made an offer for it, you

10   would consider it?

11         A.  Sure.

12         Q.  All right.  But you've done nothing

13   to list it or market it for sale?

14         A.  No.

15         Q.  Has there been a decision made by

16   Sunshine Ranch to market or list ACP for sale

17   at some point?

18         A.  No.

19         Q.  You had testified that in 2023

20   Sunshine Ranch made a 3.5 million dollar

21   capital contribution to ACP, do you recall

22   that testimony?

23         A.  Yes.

24         Q.  Were any of the shareholders

25   notified of that capital contribution?

1          A.  No, except my dad.

2          Q.  And do you know were there any

3     documents signed or executed in connection

4     with that?

5          A.  Maybe in the income tax Bernie might

6     have did something there.

7          Q.  Okay.  But no formal agreement,

8     nothing like that?

9          A.  No.

10         Q.  All right.  All right, sir, you had

11    asked -- you were asked some questions about

12    your discussions with Lisa and Alden Zuhlke

13    and you -- in those discussions you said you

14    continued to kind of advance the question to

15    the Zuhlkes about 'what is the plan', do you

16    recall that testimony?

17         A.  Yes.

18         Q.  You want to know the plan.  Sir, I

19    guess I'm kind of curious, what plan were you

20    looking to hear, I mean, what were you wanting

21    to hear there?

22         A.  It's not what I wanted to hear, what

23    I wanted to hear is what it's going to do to

24    affect Sunshine Ranch.

25         Q.  Okay.  So, in other words, you were

chatting with them because you were concerned
that somehow the trustee's receipt of this 11
percent was going to affect Sunshine Ranch?

A.  Only to the tune of 1.7 million or
whatever number you guys came up with to try
to get me to offer that.

Q.  Okay.  And I want to be clear.  When
you say 'you guys', who are 'you guys'?

A.  So far you guys have said, well, it
was probably not any value and then you looked
at the -- I'm not saying you.

Q.  Oh, okay.  Yeah, you said 'you
guys', I just want to know who.

A.  In public record it says, well, they
have land that has value of at least 18
million, I didn't give them that number.  And
then you guys dig and dig and dig, I don't
know what number people are going to come up
with, but it does affect it because they want
somebody to do something with it.  They want
somebody to come up and try to pay some of
this debt.  And I was willing to try to see if
they had a plan to whether or not if I paid
this money maybe I would get the 11 percent in
return and be out of her hair.  Maybe if their

1  debt was more than what somebody thought 11

2  percent was worth, maybe we would do something

3  different like get a piece of land or

4  something, too, because 4 million dollars is a

5  lot of damn money.  And I don't think that

6  anybody in their right mind would give

7  4 million dollars for her 11 percent share.

8  So, I'm wondering if they had a plan.

9       Q.  So, were you looking for Lisa and

10 Alden to somehow pay something or what was --

11      A.  I was looking to see if they had a

12 plan.  Just say to me, hey, this is our plan.

13      Q.  Okay.

14      A.  We're going to skip the next seven

15 or eight court dates, we're going to move to

16 Arizona and we're going to be gone.  I don't

17 know what their plan is.  Things have been

18 going on for several years.

19      Q.  Okay.  So, let's back up here.  So,

20 with regard to the 4 million dollars that was

21 offered, I want to be clear, who offered that,

22 who is offering that?

23      A.  Nobody did.  I testified earlier

24 that I went to the bank and I applied for a 4

25 million dollar loan.

1          Q.  On behalf of Sunshine Ranch or on

2     behalf of you personally?

3          A.  Me personally.

4          Q.  Okay.  All right.  And as I

5     understand your testimony, you were approved

6     for the loan at 4 million dollars, correct?

7          A.  That's what I said.

8          Q.  And with regard to that 4 million

9     dollars, what were your specific plans in

10    terms of an offer you were going to make the

11    trustee?

12         A.  That was not an offer to the

13    trustee.

14         Q.  No, I know, I understand that.  I

15    understand there wasn't an offer made.  I'm

16    asking what your plans were in terms of was

17    that for -- were you anticipating that

18    4 million dollars to redeem Lisa's 11 percent,

19    were there other assets involved in that?

20    Just kind of just walk me through what in your

21    mind that 4 million dollars was going to

22    achieve.

23         A.  In my mind it's pretty black and

24    white.  I said that I applied for a 4 million

25    dollar loan.  They owed the bank 3.8 million

```
1   plus attorney fees, plus fees, plus federal

2   income tax, plus state income tax, plus

3   wherever else.  I thought 4 million dollars

4   might save them from going to court, going to

5   jail, be accused of fraud, whatever else,

6   that's why I applied for it.  Got approved the

7   day before they sold land at the sheriff's

8   sale in Antelope County, which Richard Garden

9   was there.

10          Q.  Uh-huh.

11          A.  The boys bought the land, the guy

12  bought a house, 711,000.

13          Q.  Yeah.

14          A.  That's what I thought.

15          Q.  Okay.  So --

16          A.  In my mind.

17          Q.  Absolutely, no, and that's what I'm

18  after.  So, the 4 million dollars was in

19  effect to buy all the debtor's assets?

20          A.  Not all the debtor's assets.  To pay

21  off the bank.

22          Q.  Okay.  Pay off Rabo?

23          A.  Yes.

24          Q.  Okay.  And what would you get in

25  return for doing that?
```

1      A.  11 percent.

2      Q.  Okay.  So it's for the 11 percent.

3      A.  Maybe buy the land at the sheriff's

4  sale.

5      Q.  Okay.  Other than the 1.7 million

6  dollar offer that we saw in -- on Exhibit 26,

7  were there any other offers that Sunshine

8  Ranch, not you personally, Sunshine Ranch made

9  to redeem the 11 percent interest?

10      A.  There was some verbal back and

11  forth, but I don't recall anything in writing.

12      Q.  Okay.  And what do you recall about

13  the verbal back and forth?

14      A.  Between me and Ron Temple, my

15  previous counsel, about what the bank may or

16  may not accept.

17      Q.  Okay.  All right.  But to your

18  knowledge did Ron Temple have any

19  conversations with either Phil Kelly or Dick

20  Garden about the offers that -- an offer that

21  you were going to make?

22      A.  This one (indicating).

23      Q.  All right.  All right.  Did -- and I

24  apologize, 1.7 million, that was on behalf of

25  Sunshine Ranch or you personally?

1          A.  I hadn't decided.

2          Q.  And have you discussed these offers

3    with any other shareholders of Sunshine Ranch?

4          A.  Yes.

5          Q.  Who have you discussed them with?

6          A.  My brother, my sister, my

7    brother-in-law, my dad, my mom.

8          Q.  Okay.  And tell me about the

9    discussions.

10         A.  I just showed them what this

11   paperwork looks like (indicating).  I said,

12   'They're in debt this much.  What do you think

13   about this?'  You know what my brother said?

14   'Doesn't he remember, I wanted to build a new

15   auto parts store in Louisville, Nebraska.  I

16   went to my banker and I said I have 11 percent

17   of Sunshine Ranch.  He says it's worth

18   nothing.  Closely held family corporation, no

19   dividends ever paid.'  He said, 'Tell them to

20   go pound sand.'

21         Q.  Okay.  All right.  So, did -- with

22   regard to the offer that was made, did they --

23   it sounds like they did not approve of you

24   making the offer on behalf of Sunshine Ranch;

25   is that correct?

1          A.  I told them what I was going to do,

2     it never got accepted.

3          Q.  Okay.

4          A.  And what they forget to put in here

5     is there was a ten day deal there.

6          Q.  What do you mean by that?

7          A.  Only good for ten days, the offer

8     was good for ten days.

9          Q.  Okay.  And were there multiple

10    communications similar to this one between Ron

11    Temple, and the trustee, and Dick Garden; do

12    you know?

13         A.  Not that I know of.  They were

14    talking about what about, you know, whatever

15    the e-mails say, but this is the only one

16    probably with money that was in writing.

17         Q.  Okay.  But any e-mail with regard to

18    offers would have been sent through your

19    counsel, Ron Temple, at the time, correct?

20         A.  That's correct.

21         Q.  All right.  Sir, if I could, I'd

22    like to hand you what's been marked as

23    Exhibit 27, I believe -- Oops, 28 sorry.

24              MS. GOODMAN:  Here's a copy for you

25    (indicating to Mr. Garden).

1         Q.   (Ms. Goodman) Here it is, right

2    here, 28.  Do you recognize this document?

3         A.   Yes.

4         Q.   Okay.  And can you explain what it

5    is?

6         A.   Sunshine Ranch Company balance sheet

7    as of August 31st, 2024.

8         Q.   Okay.  And I want to ask, just

9    because I noticed the numbers differ a little

10   bit between this balance sheet and what is

11   listed in Exhibit 10, and so I want to just

12   ask if I understand why.

13        A.   This is what the banker came up with

14   (indicating), this is what the accountant used

15   and got with the numbers that were supplied to

16   him.

17             MR. KELLY:  Excuse me, what Exhibit

18   number is it?

19             MR. GARDEN:  You probably don't have

20   it, Phil, it's Exhibit 28.

21             MR. KELLY:  28, and it's a balance

22   sheet?

23             MR. GARDEN:  August 31, 2023.

24        A.   2024.

25             MR. GARDEN:  Yeah, it's got '24 and

1    '23.

2            MS. GOODMAN:  Yeah, and it's got an

3    income statement in the back as well.

4            Q.  (Ms. Goodman) Let me ask some

5    questions here then.  With regard to this

6    balance sheet, this shows a FSC note payable

7    of 1.2 million dollars as a current asset, do

8    you see that?

9            A.  Well, I see it on your deal, I don't

10   know where it is here.

11           Q.  Oh.

12           A.  But Farm Credit Service.

13           Q.  Yeah, right there (indicating).  And

14   I just want to be clear, is that the same loan

15   that's on the balance sheet?

16           A.  Yeah, it changes daily.

17           Q.  Okay.  All right.  With regard to

18   the note from Doug Hall, the Doug Hall note,

19   that is not listed -- or it is actually --

20   strike that.  Strike that.

21           All right.  As we go through here,

22   I want to ask how were these values determined

23   under the fixed asset?

24           A.  Depreciation is pretty easy, how

25   much we've depreciated.  Land, they just have

1   a value that we might have paid for it.

2         Q.  Okay.

3         A.  Land and improvements, buildings and

4   improvements, what we might have paid for it;

5   equipment, what we paid for it; vehicles

6   purchased, what we paid for it minus the

7   depreciation, minus the accumulated depletion

8   comes up with the number.

9         Q.  Okay.  So, your understanding is

10  this is cost less depreciation is the value?

11        A.  I don't know what cost less is.

12        Q.  Let me ask this, who prepared these?

13        A.  Bernie Auten; Auten, Pruss &

14  Beckmann, Norfolk, Nebraska.

15        Q.  And as I understand from this

16  morning, you provide Mr. Auten the information

17  that gets compiled here, correct?

18        A.  That's correct and I don't even have

19  to provide it, he gets it direct from Farm

20  Credit and the Brunswick State Bank.

21        Q.  Okay.  I want to go down here, let's

22  look at other assets.  There's a note

23  receivable for Morgan and Katelyn Hall in the

24  amount of 153, which we talked about this

25  morning.  What are the terms by which that's

1    getting repaid to the company?

2         A.   It hasn't -- it has a sheet,

3    amortization sheet, I don't have it with me.

4         Q.   And are they current?

5         A.   They're current.

6         Q.   And do you know what the term of the

7    obligation is?

8         A.   You mean how long it's going to

9    last?

10         Q.   Yeah.

11         A.   Maybe another three or four years.

12         Q.   All right.  So, Husker Ag is

13    indicated on this balance sheet here on

14    Exhibit 28 is not on the Farm Credit

15    Exhibit 10.  Is this -- when did -- as I

16    understand it, Sunshine Ranch at some point

17    divested from Husker Ag; is that correct?

18         A.   As far as I understand, yes, but

19    there's been some confusion.  Husker Ag has

20    given me and Sunshine Ranch a tax form every

21    year and for two or three years I've been

22    saying this is not right, and Bernie has been

23    trying to get to the bottom of what the heck

24    really happened there.

25         Q.   Okay.  Is it your testimony that

1    Sunshine Ranch still owns an interest in

2    Husker Ag?

3         A.  No.

4         Q.  Do you know, was the interest sold?

5         A.  I think that I probably bought it,

6    but for some reason -- I've been up to Husker

7    Ag three times talking to them about it and

8    every time we got it straightened out and

9    every year it shows up again.

10        Q.  What do you mean you bought it, from

11   Sunshine Ranch?

12        A.  Bought it, something -- I don't know

13   how in the hell it happened, it's a lot of

14   years ago.

15        Q.  Okay.  So, is it your testimony

16   then, sir, that you personally purchased the

17   interest from Sunshine Ranch and Husker Ag?

18        A.  I must have.  I don't have any idea

19   how this thing happened.

20        Q.  And you don't know sitting here

21   today how much you paid for it?

22        A.  No.

23        Q.  And just to be clear, do you know

24   why Husker Ag currently sits as of

25   August 31st, 2024, on the balance sheet for

1   Sunshine Ranch?

2          A.  Because they still give us basically

3   an IRS form that says they paid, you know,

4   this much dividend or whatever, which they

5   didn't.

6          Q.  Okay.  So, you're receiving

7   documents from Husker Ag indicating that you

8   paid -- that they paid dividends to you?

9          A.  To Sunshine Ranch.

10         Q.  To Sunshine Ranch, okay.  All right,

11   sir, if we compare 2010 to the balance sheet

12   of 2022 --

13         A.  2010.

14         Q.  I'm sorry, of August 31st of 2022.

15         MR. GARDEN:  What exhibits are we

16   comparing?

17         MS. GOODMAN:  28 and 10.

18         MR. GARDEN:  Okay.

19         Q.  (Ms. Goodman) The pictures look

20   different in terms of the amounts and the

21   numbers.  I guess if I had to go off of --

22   well, how do I determine what Sunshine Ranch

23   owned as of '21/'22 timeframe?

24         A.  (No response.)

25         Q.  Would I look at what's on the Farm

1    Credit, is this Exhibit 10, is this the most

2    consistent asset listing as to what would have

3    been owned?

4         A.  This is '25 (indicating).

5         Q.  Yeah, understood, but I'm just

6    wondering because if I compare the document

7    ending in 1048, which relates to 2022, to the

8    balance sheet in 2025 --

9         A.  2022 to 2025 now, you're asking

10   about '21, '22 compared to '25, or what are

11   you asking?

12        Q.  What I'm asking is if I look at

13   2022, the balance sheet for 2022, okay?

14        A.  And I don't know where that is,

15   but. . .

16        Q.  It's right here (indicating).  It's

17   Exhibit 28 if you go to --

18        A.  It says '24.

19        Q.  If you turn the page though, sir,

20   and go down to 1048.

21        A.  (Witness so doing.)

22        Q.  Okay.  If I compare this to the

23   balance sheet in 2025, which is Exhibit 10,

24   the numbers are dramatically different; do you

25   see that?

1          A.  Okay, we got total assets 1.9

2     million.

3          Q.  Uh-huh, yep.  And if you take a look

4     at 2025, you're showing total assets of 19.4

5     million.

6          A.  But this is what Bernie did and this

7     is what Farm Credit did.

8          Q.  Okay.  So I guess which one is

9     accurate?

10          A.  Tell me what that piece of ground

11     over there is going to bring tomorrow

12     (indicating).

13          Q.  I ask you the questions, which one

14     is accurate, is it the one in 2022 or the one

15     in 2010 -- or 2025, which is Exhibit 10?

16          A.  I can't answer that.  The bank used

17     his numbers that he's going to loan money

18     against, the accountant used numbers that

19     maybe where the land was purchased 50 years

20     ago.

21          Q.  Okay.  All right.  Let's do it

22     another way.  If I look at Exhibit 10, sir,

23     okay, it lists assets, non-current assets,

24     equipment, machinery, vehicles, land,

25     everything else.  Is this a complete list of

assets that was owned by Sunshine Ranch in 2021 and 2022?

A.   They added some machinery, probably.

Q.   Okay.

A.   I bought 20 acres from them.  There might have been some other back and forth stuff, but as far as I don't know what you mean by assets.  Did we buy any more ground, no.

Q.   Okay.  All right.  So, other than the 20 acres, the ground was the same that Sunshine Ranch owned from 2025 to 2021, '22 timeframe?

A.   Yes.

Q.   All right.  And then what about equipment?

A.   Might have bought and sold different equipment.

Q.   All right.  But sitting here today, sir, is the asset list in Exhibit 10 with regard to the equipment, is that for the most part what Sunshine Ranch owned in 2022?

A.   2022 they didn't own an Elmers grain cart.  It says right here $67,000.  2022 they didn't own a Claas 750 combine.  2022 they did

1   own those two things.  They didn't own a Claas

2   740 combine.  They didn't own a Vermeer mower.

3   They didn't own a Farm Aid 650, it says boot

4   on there, it's a feed wagon.  They don't own a

5   24-inch squeegee, but they owned something

6   else they traded off for it, possibly.

7        Q.  Okay.  All right.  So, even though

8   they didn't own this property in '21, '22,

9   they more likely than not owned something

10  similar?

11       A.  Yes.

12       Q.  All right.  Sir, let me ask, has ACP

13  -- well, strike that.

14            If we can stay on Exhibit 28, sir.

15  And can you turn to page -- it starts at 1050

16  down at the bottom.

17       A.  (Witness so doing.)

18       Q.  All right.  Is this a fair

19  representation of profit and loss for Sunshine

20  Ranch in years 2021, '22, '23 and '24?

21       A.  Define 'fair'.

22       Q.  Is it accurate?

23       A.  It's what the accountant got and he

24  put together these numbers.

25       Q.  Okay.  All right.  So, it appears

1    from these numbers that Sunshine Ranch was

2    operating at a loss, had a net loss every year

3    for the last three years; is that correct?

4         A.  (No response.)

5         Q.  If you look at page 3 if you go to

6    the very end, the very last page --

7         A.  You told me to look at this page.

8    Negative in front of it means loss.

9         Q.  Yes.  That's what I understand it,

10   but is that accurate?

11        A.  Yep.

12        Q.  And is it fair to say that the only

13   reason that it's a loss, a net loss, is as a

14   result of the ACP activities?

15        A.  Not necessarily.

16        Q.  All right.  So, let's dig into that.

17   If you turn to page 2, sir.

18        A.  (Witness so doing.)

19        Q.  It appears that the ACP activities

20   are --

21        A.  Page 2, we're on a different page 2.

22        Q.  All right, sir, I apologize.  If you

23   go to the second to the last page of the

24   document.  There it is.

25        A.  (Witness so doing.)

1        Q.  It appears that with regard to most

2   years, with the exception of one, the ranch

3   itself is operating at a profit, but for then

4   the ACP activities.  Am I reading that

5   correctly?

6        A.  You are.

7        Q.  So, other than ACP activities, you

8   had indicated that Sunshine Ranch does

9   sometimes operate at a loss.  What causes that

10  loss, do you know?

11       A.  Price of corn, price of beans.

12       Q.  Okay.  Sir, with regard to ACP, has

13  it ever been profitable?

14       A.  Yes.

15       Q.  All right.  What years was it

16  profitable?  Was there a timeframe or a range

17  of years?

18       A.  I thought we were talking about

19  Sunshine Ranch, but you want to include a

20  minority shareholder's interest in another

21  company, is that what you want me to answer?

22       Q.  Well, I'm just asking the question,

23  sir, I would like to hear about the operations

24  of ACP.  Has it ever been profitable?

25       A.  Yes.

1          Q.   What years has it been profitable?

2          A.   I don't have them in front of me,

3     but I can give you an example.  How much time

4     do we have?

5          Q.   I mean, it seems like kind of an

6     easy question, I mean, if you don't recall if

7     it's ever been profitable or what years

8     then --

9          A.   I said yes.  This is the third time

10    now I've said yes.

11         Q.   Okay.  All right.

12         A.   That doesn't mean I don't recall.

13         Q.   Okay.  So, what years?

14         A.   The thing was bought, enough shares

15    to have somebody else run it in 2004.  It had

16    a debt of its own which we bought from the

17    other shareholder plus the debt that was for

18    the place itself because it wasn't paid for.

19         Q.   Uh-huh.

20         A.   We had two debts there.  I had an

21    idea that I could get the thing paid off in

22    three years.  If you look at 2021, the thing

23    was paid off and had 2.6 million dollars in

24    the bank in a savings account drawing very

25    small interest, like .6 percent.  At the time

1    there was a little bit of scare about people

2    scamming you out of your money or hacking into

3    your bank account.  I was sitting there with

4    2.6 million dollars in the bank, only had them

5    try to hack it twice.

6              Then we had 2020 come along that

7    changed the way I thought about the whole

8    thing.  Couldn't get rid of pigs, people I had

9    a contract with backed out and I said I'm

10   going to stack up the pigs, my dad said kill

11   them all, which in case you don't know that's

12   what some people did.  They thought it was fun

13   for about the first three semi loads and then

14   it turned to a stinky bloody squealing screwed

15   up mess.  People invited their friends over to

16   help shoot them.  We didn't shoot them.  I

17   said if I ever get through this I'm either

18   going to sell this damn place, or I'm going to

19   raise genetics for another company basically

20   to raise gilts, or I'm going to become a

21   preacher.  I picked the wrong choice.

22        Q.  Okay.  So, with regard to the

23   operations of ACP, it sounds like they were

24   profitable at one point, but for the last five

25   years, as I understand it, ACP has not been

1    profitable?

2          A.   Four to five years.

3          Q.   Four to five years, okay.  At the

4    time that it was profitable was it paying

5    distributions at all?

6          A.   We paid some distributions.

7          Q.   And who received those

8    distributions?

9          A.   Sunshine Ranch, Doug Hall, the other

10   two partners.

11         Q.   Can I ask is there some reason why

12   Sunshine Ranch has never paid distributions to

13   shareholders?

14         A.   Yes, there is.

15         Q.   Why is it?

16         A.   In about a month and a half we have

17   owned the same piece of ground, the Halls, for

18   100 years.  We are farmers.  I know you don't

19   see the relevance in this.  When they started

20   Sunshine Ranch, my dad, and my grandpa, and my

21   grandma put everything they owned into it, and

22   there was a unwritten law that said you don't

23   sell it.  And we just kept growing it.

24              And if you're going to grow, you

25   can't pay the other siblings to squander the

1    money away or you just sit there.  And then

2    when the hierarchy dies, like my dad, they all

3    come and get some attorney to break it all up,

4    and that was not what my grandpa wanted and

5    it's not what my dad wants, it's not what I

6    want, but I'm the third generation.

7            First generation makes it, second

8    generation tries to keep it, the third

9    generation loses it.  I'm the third

10   generation.

11       Q.  All right.

12           MS. GOODMAN:  I'm going to go ahead

13   and mark this as well, if I could.

14           (Exhibit No. 29 was marked.)

15       Q.  (Ms. Goodman) All right.  Sir, so

16   I'm handing you what's been marked as

17   Exhibit 29.  Do you recognize this document?

18       A.  Sure.

19       Q.  All right.  What is -- can you just

20   explain what it is?

21       A.  It basically reports the acres, and

22   the yield, and the share of this entity at the

23   Farm Service Agency.

24       Q.  Okay.  And so does this set of

25   documents relate to Sunshine Ranch?

1          A.  It says Sunshine Ranch Company on

2     top (indicating).

3          Q.  Perfect.  And is this --

4          MR. KELLY:  Excuse me, what is it?

5          A.  Sunshine Ranch Company on top.

6          MR. KELLY:  Sunshine -- okay, what's

7     the document?

8          A.  Report of Commodities Farm Summary.

9     You do that at the FSA, they printed this off.

10         MR. KELLY:  Commodity form summary?

11         A.  Report of Commodities Farms Summary.

12         MR. KELLY:  Thank you.

13         Q.  (Ms. Goodman) All right, sir, and

14    what year is this for?

15         A.  2024.

16         Q.  Okay.  So, do I understand that

17    there would be a similar report for 2023, and

18    2022, and 2021?

19         A.  If I signed up for the program, if I

20    did sign up for the program, which I did.

21    You're going backwards I thought you was going

22    to go frontwards.

23         Q.  Okay.

24         A.  Yes, there is.

25         Q.  Okay.  Could you produce to me the

1    reports for 2021, 2022, 2023?

2          A.   You already ordered me to, I guess I

3    could.

4          Q.   Okay.   Perfect.   How do these

5    yields -- just if you can recall, and if not

6    it's no big deal, I'll get the documents, but

7    how do the field reflected in this report in

8    Exhibit 29 compare to what was produced by

9    Sunshine Ranch in 2022?

10         A.   The yields are set by this office.

11         Q.   Okay.   Okay.   So, help me understand

12   this, sir, does this reflect the --

13   essentially the results of the farming

14   operation for Sunshine Ranch?

15         A.   No, this is -- it says right here,

16   what was this, pasture, identify where the

17   crops were put.

18         Q.   Okay.

19         A.   And then they add it all up, how

20   much was dryland, how much was irrigated, and

21   when you see these other names here, they

22   basically rented the pasture, Lucas and Don

23   50/50.

24         Q.   Okay.

25         A.   And that's why their names are up

1    here in front.  Travis and Todd rented some

2    pasture.

3         Q.  Got it.  So does this tell us how

4    much --

5         A.  No.

6         Q.  -- yield?

7         A.  You just reported to them your acres

8    that you planted.

9         Q.  Okay.

10        A.  And you reported, yes, in the last

11   few years you started to have to certify the

12   pasture.

13        Q.  Okay.

14        A.  So, that's why the pasture is there.

15   If I didn't plant that pasture this year, you

16   have to certify it.

17        Q.  So if I wanted to understand how

18   much corn, beans, crops Sunshine Ranch

19   produced on an annual year, where would I

20   look?

21        A.  You asked for all of the sheets, all

22   of the scale tickets, I gave you one year's.

23        Q.  Yep.

24        A.  And then I asked the grain company

25   can you help me out, we can give you a

1    summary, and I gave that to you, of the years

2    that you asked for.

3         Q.  Okay.  So, I would look to the scale

4    tickets and the grain summary?

5         A.  Scale tickets for this year, the

6    summary is the sum of several years.

7         Q.  Okay.

8         A.  Do you have that or do you need

9    that?  It came from J.E.M. Meuret Grain

10   Company.

11        Q.  Okay.  I'll look and if I don't, I

12   will get back to you, but I will look.  All

13   right.  Let's see here.  Just a few more here.

14   Did Sumner A. your father, has he formally

15   stepped down from running the company?

16        A.  I don't know what you mean by

17   'formally'.

18        Q.  I mean, I guess, he's still an

19   officer, correct?

20        A.  Correct.

21        Q.  Does he -- what role does he have

22   currently in running the company?

23        A.  Drives around in his 2024 pickup and

24   aggravates the shit out of us.

25        Q.  All right.  All right.  All right, I

1    want to look at Exhibit 25 here.  Exhibit 25

2    is a stack of photos that it's my

3    understanding you produced to Dick Garden and

4    the trustee; is that correct?

5        A.  I did to Dick Garden.

6        Q.  To Dick Garden, all right.  First

7    off, does Sunshine Ranch claim an ownership in

8    any of the property listed in Exhibit 25?

9        A.  No.

10       Q.  Okay.  Do you personally claim an

11    interest in any of the property?

12       A.  No.

13       Q.  Okay.  Other than your internet

14    research, do you personally know who owned any

15    of this property?

16       A.  It says on the registration on the

17    pickups that I produced.

18       Q.  Okay.  And when you looked at the

19    registration, did you have permission from the

20    owner to go into the trucks to review the

21    registration?

22       A.  It was sitting on a property that

23    wasn't owned by them, for several months, this

24    one right here was (indicating).

25       Q.  You didn't answer my question.  When

1    you went in to re --

2          A.  I knew where this was going, no.

3          Q.  You did not have permission?

4          A.  Nope.

5          Q.  Okay.  You referenced several

6    instances when you took pictures of property

7    that were located on the, quote, Blair

8    property; do you recall that?

9          A.  Yep.  Yep.

10          Q.  Did the owner give you permission

11    from -- the owner of Blair property give you

12    permission to enter their land to take photos?

13          A.  No.  I don't know who the owner is.

14          Q.  Do you know -- do you know whether

15    the property sitting on the Blair property

16    belongs to the owner of the Blair property?

17          A.  It's pretty evident in the

18    registration with the Court records at the

19    courthouse who it's registered to, titled to.

20          Q.  Okay.  Prior to walking onto the

21    Blair property without permission, did you

22    know who owned this property?

23          A.  I didn't know who owned the property

24    that was the Blair property, no.

25          Q.  Okay.  With regard to the property

1    in Exhibit 25, prior to entering the Blair

2    property without the permission of the owners,

3    did you --

4            A.  Which owners, the owners of this

5    (indicating) or the owners of the property?

6            Q.  The owners of this (indicating).

7            A.  Okay.

8            Q.  Exhibit 25, the pictures in here.

9    Prior to entering the Blair property without

10   the permission --

11           A.  This is not the Blair property

12   (indicating).

13           Q.  You identified numerous pieces of

14   property --

15           A.  That's correct.

16           Q.  -- in Exhibit 25.

17           A.  Right.

18           Q.  Okay.  So, with regard to the

19   property you identified in Exhibit 25 that you

20   purportedly took photos of standing on the

21   Blair property, correct?

22           A.  This is not the Blair property.  I'm

23   going to say it again.

24           Q.  We can go through this one-by-one if

25   that's what you want to do.

1      A.  No, I'm just wondering what your

2   question really is.

3      Q.  I'm asking you --

4      A.  Did I ask permission of anybody to

5   walk on here.  This one right here the guy

6   turned out his cows in.  The guy that owns it,

7   the property, turns his cows out in there.  He

8   says there's pickups up here that say Diamond

9   Z on it.  I drove up there and there it was.

10      Q.  So, you talked to the property owner

11   of the property that this Exhibit -- this

12   truck is sitting on?

13      A.  Yes.

14      Q.  Okay.

15      A.  He was turning his cows out there.

16      Q.  Okay.  And does --

17      A.  His wife and his kids were making

18   the fence.

19      Q.  Okay.  He gave you permission to

20   come on and take pictures?

21      A.  He didn't say you can take a

22   picture.

23      Q.  Okay.

24      A.  You think that's funny.  He said

25   there's property up here that says Diamond Z

```
 1    on it.  I can read (indicating).
 2         Q.  So, did somebody call and notify you
 3    of this Diamond Z property?
 4         A.  The guy said he was turning in his
 5    cows in there and he saw it.
 6         Q.  I understand.  Did he call you, sir?
 7         A.  Yes.
 8         Q.  He called you?
 9         A.  Yes.
10         Q.  Doug Hall?
11         A.  Yes.
12         Q.  And said I'm turning my cows out
13    onto this property?
14         A.  Yeah.
15         Q.  He actually -- he picked up the --
16    how did he know to call you?
17         A.  I know him.
18         Q.  Okay.
19         A.  It has the same damn last name as
20    those two back there (indicating).  They're
21    concerned about this whole deal, too.  If you
22    think it's just me and a few little people
23    around here, there is a bunch of people
24    concerned about this and that same last name
25    as those people.
```

1          MS. GOODMAN:  I'm going to move to

2     strike as not responsive.  There's no pending

3     question.  Should we take a break here?

4          A.  We don't need to take a break, let's

5     go.  In case you don't know, it's the farming

6     season.  You think it's funny, it's not.

7          Q.  (Ms. Goodman) I don't think it's

8     funny, sir.  I just am trying to understand

9     what your basis is to conclude that this

10    property belongs to Alden and Lisa Zuhlke.

11         A.  (Indicating).

12          MR. GARDEN:  Let the record reflect

13    that the witness is pointing to two

14    registrations.

15          MS. GOODMAN:  Two registrations.

16         A.  One says Diamond Z Farms, one says

17    Alden and Lisa Zuhlke.

18         Q.  (Ms. Goodman) Okay.  And I also want

19    the record to reflect in order to get the

20    registration, did you have to go into the

21    vehicles of these -- inside of these vehicles?

22         A.  Yep.

23         Q.  And you didn't have permission from

24    any of the owners to get that?

25         A.  Nope.

1          Q.  Did you have permission, sir, to

2     enter the Plainview property where you

3     found --

4          A.  Nope.  You think it's funny, I

5     don't.  .  .

6          Q.  Sir, have you reviewed the replevin

7     documentation that was filed by Rabo with the

8     State Court?

9          A.  Explain what replevin and what

10    document you're talking about.

11         Q.  So, it's my understanding that Rabo

12    sought to actually replevin all the personal

13    property of Alden and Lisa Zuhlke, are you

14    familiar with that at all?

15         A.  Replevin means repossess?

16         Q.  Yes.

17         A.  Yes.

18         Q.  Okay.  Have you reviewed the Court

19    filings in connection with that replevin?

20         A.  I seen most of them, maybe all of

21    them.

22         Q.  Okay.  Have you compared those court

23    filings to the property that has been

24    identified in Exhibit 25?

25         A.  No.

1      Q.  Sir, do you -- are you employed by

2  Rabo?

3      A.  No.

4      Q.  Is Rabo or the trustee currently

5  paying you for your time?

6      A.  No.

7      Q.  Have Rabo or the trustee made any

8  promises to you in connection with your -- the

9  assistance that you're providing to them in

10  this case?

11      A.  No, I'm not providing assistance and

12  I'm not getting paid.  I have my own interest

13  to look after.  And you think that's funny.

14      Q.  Well, I want to ask, does your own

15  interest have anything to do with this

16  property sitting in Exhibit 25?

17      A.  At one time if I was going to buy

18  out Lisa's 11 percent interest, which the

19  trustee has ownership of.

20      Q.  Uh-huh.

21      A.  And some of their assets, if the

22  Sheriff would have done his job and

23  replevined, as you say, repossessed this stuff

24  or some of it, it would lessen the amount to

25  buy out Lisa's share and to pay off the bank.

1   Now, you think that I just dropped out of the
2   sky and did this, this thing has been going on
3   for several years.  I didn't just go up there
4   and haphazardly do it, this stuff has been
5   sitting around, nobody is doing their job in
6   this deal.
7        Q.  Have you talked, sir, to any
8   investors or individuals who may be interested
9   in purchasing the 11 percent interest?
10       A.  No.
11       Q.  You had indicated earlier in your
12  testimony that there was a threat that was
13  made around the time that you were
14  contemplating this 4 million dollar loan, do
15  you recall that at all?
16       A.  A threat?
17       Q.  Yeah, there was a threat with regard
18  to Sunshine Ranch.
19       A.  A threat, explain this.
20       Q.  That was the word -- I wrote it
21  down, that was the word I heard this morning;
22  do you recall that testimony?
23       A.  I recall all my testimony, but I
24  never said 'threat'.
25       Q.  Okay.  All right.  So, you don't --

1   at no point in this have you ever felt as

2   though Sunshine Ranch was threatened at all by

3   the bankruptcy of the Zuhlkes?

4        A.  Sure it is.

5        Q.  Okay.  So, what do you mean by --

6   what do you -- explain that.

7        A.  I tell you what, I'll do what the

8   John Deere dealer told me once, 'Your dad

9   doesn't believe in doing any estate planning,

10  I want you to send him in here.'  He said,

11  'I'll tell him to sign a check and then I'll

12  write out what I think the estate is.'  Dad

13  said, 'I'm not going to do that.'  You write

14  out, sign the check and I'll write a check

15  deal for 1.7 million, and if that bothers you,

16  it bothers Sunshine Ranch, it bothers me that

17  I might have to somehow cough that up, but I

18  said the hell with it, you guys can have it.

19  It's a big damn number.

20       Q.  Okay.  What's a big damn number?

21       A.  1.7 million.

22       Q.  I want to just be clear on a few

23  other items just with regard to you gave some

24  testimony about Z Brothers and Swine 84; do

25  you recall that?

1          A.   Yes.

2          Q.   Have you ever been a partner in

3     either of those two entities?

4          A.   No.

5          Q.   All right.  So, you have -- have you

6     ever been to a meeting --

7          A.   No.

8          Q.   -- with regard to either of those

9     entities?

10         A.   No.

11         Q.   All right.  So sitting here today,

12    you have no personal knowledge as to the

13    business, the shareholder affairs, anything

14    with regard to either of those two entities,

15    correct?

16         A.   That's not true.

17         Q.   Okay.  So, what isn't true about

18    that?

19         A.   I've never been to a shareholder

20    meeting.

21         Q.   Okay.

22         A.   Don't have any interest in it.

23         Q.   Okay.

24         A.   But I do have some personal

25    knowledge about it.

1        Q.  Okay, where did you get that

2   personal knowledge from?

3        A.  Testified about it today on Z

4   Brothers.  Three brothers bought out a quarter

5   of ground.

6        Q.  Okay.  But you weren't part of that

7   transaction, were you, sir?

8        A.  No.  Testified that Kuhlman and I

9   talked.  Kuhlman didn't think he had any

10  problem with this deal, thought he had a

11  bulletproof contract.  I testified about that

12  this morning.

13       Q.  All right.

14           MS. GOODMAN:  Let's take a quick

15  break here.  I may have just a few more and

16  then I don't know if you have any.

17           MR. GARDEN:  Phil, what do you have?

18           MR. KELLY:  I have a few questions.

19           MR. GARDEN:  All right, I'm going to

20  stand up.

21       A.  I'm ready.

22           MS. GOODMAN:  Well, can we take just

23  a quick break here -- oh, Phil is going to go

24  now.  All right, go ahead.

25

## EXAMINATION BY MR. KELLY

1

2      Q.  It's good to see your face, we

3  talked on the phone on one occasion after you

4  dropped off the corporate records.

5      A.  How's the knee, how's the knee?

6      Q.  My knee is three weeks out today

7  from being replaced.

8      A.  Garden is laughing.

9      Q.  Yeah.

10     A.  The reason I say that is because a

11  neighbor did his knee and he didn't exercise,

12  he didn't take physical therapy enough, and he

13  had to go in and get knocked out and then the

14  hospital straightened it out, it wasn't any

15  fun.

16     Q.  Well, I'll give you the full report,

17  I can go forwards and backwards on the

18  bicycle, and I got 100 degrees in flexion

19  already.

20     A.  And I had a hip replaced a little

21  over a year ago.

22     Q.  Okay.  Now let's talk about the

23  questions.  Could you find the exhibit that is

24  the number 5 for me, the shareholder minutes

25  for Sunshine?

1        A.  I got it.

2        Q.  Do you have that there?

3        A.  Yes.

4        Q.  So, I got an e-mail on March 21st

5   from Brad Easland where Lisa Zuhlke was

6   apparently representing to him so that he

7   could represent to me that -- and I'm

8   paraphrasing here, 'She's never received any

9   money, dividends, or a K-1, or any other

10  documents regarding Sunshine Ranch, and she's

11  never attended an annual meeting for the

12  corporation, and knows very little about

13  Sunshine Ranch.'

14          So, in Exhibit 5 towards the end, go

15  find the January 1989 stockholder minutes.

16       A.  (Witness so doing.)

17       Q.  And look at the '89 and '90 minutes.

18       A.  That's almost to the end.

19       Q.  Close to the end.

20       A.  I've got '89.

21       Q.  Yeah.  The Waiver of Notice of

22  Annual Meeting of Shareholders of Sunshine

23  Ranch dated January 2nd of 1989.  Did you find

24  that?

25       A.  Yep.

1          Q.   Okay.   Is Lisa Zuhlke's signature on

2     that as a shareholder?

3          A.   It does appear to be.

4          Q.   Okay.   Then let's go to the minutes

5     for January 2nd, 1989.   Right at the top there

6     it says, 'The following being all of the

7     shareholders of the corporation were present.'

8     And does it list Lisa Zuhlke?

9          A.   Yes.

10          Q.   Okay.   And on towards the -- that's

11     signed by the secretary.   And this set of

12     minutes has just kind of a catch-all

13     resolution, doesn't it, where the stockholders

14     approve all the acts that have happened in the

15     previous year?

16          A.   Yes.

17          Q.   Okay.   So, let's go to the

18     January 2nd, 1990, Waiver of Notice of Annual

19     Meeting.   Did Lisa Zuhlke sign that waiver?

20          A.   It looks like it, yes.

21          Q.   Okay.   And would it be the practice

22     that these would be signed at the meeting?

23               MS. GOODMAN:   Objection, foundation.

24          Q.   (Mr. Kelly) Were you at the meeting?

25          A.   Are you talking to me, Doug Hall?

1    Q.   Yeah, Mr. Hall, were you at the

2  meeting?

3    A.   This is the --

4    Q.   In January of 1990?

5    A.   This was just a form, there was no

6  meeting.

7    Q.   Okay.  But the waiver, did you sign

8  the waiver also?

9    A.   Yes.

10    Q.   Okay.  All right.  And was it -- did

11  you attend that meeting?

12    MS. GOODMAN:  Objection, form and

13  foundation -- well, no foundation, just form,

14  just form.

15    Q.   (Mr. Kelly) Tell me what you recall.

16    A.   This is like a form that you fill

17  out, not all of these people were together, I

18  wasn't at a meeting.

19    Q.   Is that your signature though?

20    A.   Yes.

21    Q.   So, would it have been passed

22  around, perhaps, before the meeting for

23  everybody to sign?

24    A.   Perhaps before, who knows.  I can't

25  remember.

1          Q.  Do you recognize your father's

2     signature?

3          A.  Yes.

4          Q.  Okay.  Is that his signature?

5          A.  Yes.

6          Q.  And then the minutes there January

7     2nd, 1990, does it, again, list Lisa Zuhlke as

8     being present?

9          A.  Yes.

10         Q.  And then there's attested to by

11    Sumner Hall as the secretary; is that correct?

12         A.  Well, he signed it and it says

13    shareholder.  It says secretary on the second

14    page.

15         Q.  Yeah.  So, after 1990 it appears as

16    if there were no regular stockholder meetings?

17         A.  That is probably correct.

18         Q.  All right.  But at least we've got

19    evidence here of two meetings that Lisa would

20    have signed a waiver concerning an annual

21    stockholders meeting; do you agree with that?

22         A.  Yes.

23         Q.  Okay.  Which members of your family

24    relied -- have relied upon over the years the

25    resources of Sunshine Ranch to pay their

1  living expenses?

2      A.  I don't know how far to back up

3  there, but I guess what I'm saying is from

4  1966 until 1991 or somewhere close to that, my

5  dad's mission was -- fell on my shoulders and

6  my family was to pay off his siblings who

7  didn't have shares or stock certificates in

8  the company and every year some of those bonds

9  came due --

10     Q.  Okay.

11     A.  -- and to pay for any acquisitions

12  we made.  So, that was our mission, to pay off

13  dad's siblings.  After that I was doing my own

14  stuff, Sunshine Ranch was growing, I had my

15  own land, had my own income, had my own

16  machinery, approved through the FSA because

17  you had to prove that you was a farmer.  My

18  brother left in 1991.  One sister probably got

19  married -- Lisa got married sometime in the

20  early '80s.  Kim probably got married sometime

21  in the mid to early '80s.  So, nobody really

22  relied on Sunshine Ranch, we just grew it.

23     Q.  So, are you saying that living

24  expenses, for example, for your parents, were

25  they provided by Sunshine Ranch?

1    A.  No, dad had his own land, too.

2    Q.  Okay.  Did you ever take money out

3  of Sunshine Ranch to pay your living expenses?

4    A.  Not for the living expenses.

5    Q.  And what expenses did you pay out of

6  Sunshine Ranch for yourself?

7    A.  Basically there's a loan and it's in

8  the income tax and in the balance sheet.

9    Q.  Okay.

10    A.  Now, it says -- there's a $42,000

11  something that Lauren brought up, I do not

12  know what that is and I'll have to figure out

13  what the identity of that is.

14    Q.  Okay.  Would you find Exhibit 21,

15  please, the tax return?

16    A.  I probably have it here.

17         MS. GOODMAN:  Here it is

18  (indicating).

19    A.  Okay, got it.

20    Q.  (Mr. Kelly) Okay.  Someone referred

21  to line 12 which is officer salaries.

22    A.  Yeah, and that's what I was

23  referring to.

24    Q.  Okay.  What's the amount of officer

25  salaries on line 12 of the tax return?

1    A.  I thought it said 42,000 something.
2  It says 70,000.
3    Q.  Okay.  So, 70,000 was paid in
4  officer salaries in 2022?
5    A.  It says compensation of officers.
6    Q.  So, $70,000 in 2022?
7    A.  Yep.
8    Q.  Who were the officers in 2022?
9    A.  Sumner A. Hall and Douglas Alan
10  Hall.
11    Q.  Okay.  How much of that $70,000 did
12  you receive as a compensation?
13    A.  I don't know, I'd have to look.
14    Q.  But do you agree that you got
15  something as an officer salary in 2022?
16    A.  No, I don't agree with that.
17    Q.  Did it all go to your father?
18    A.  I doubt it.  I'll have to research
19  that.
20    Q.  Are you the only two officers in
21  2022?
22    A.  Yes.
23    Q.  So, logically can't we assume that
24  between you and your father you got some -- he
25  got some portion potentially and you got some

1    portion potentially of $70,000?

2         A.  I'm not going to assume any of that

3    until I research it.

4         Q.  Okay.  That's what the tax return is

5    showing.

6         A.  I know that.

7         Q.  Okay.  All right.  I understand from

8    listening to the testimony this morning and

9    this afternoon that for a number of years you

10   have simply run Sunshine Ranch and making all

11   the decisions without consulting any

12   stockholders; is that correct?

13        A.  Yes, except my dad.

14        Q.  Okay.  How much of the corporation

15   does he own?

16        A.  47 or 49 percent it says here in one

17   of these deals right here somewhere.

18        Q.  Okay.

19        A.  Somebody can dig it up.

20        Q.  All right.  So you really haven't

21   talked to the other stockholders since 1990,

22   is that fair to say, about the operations?

23        A.  No.

24        Q.  What would be fair?

25        A.  You say what would be fair?

1     Q.  Yeah, my question was you really
2   haven't talked to the other stockholders since
3   after 1990 because there's been no
4   stockholder's meetings about the operations?
5     A.  And I said no.
6     Q.  'No' you're agreeing with me, or
7   'no' you're disagreeing with me?
8     A.  I'm agreeing with you.
9     Q.  Okay.  Thank you.  Is your father
10   still involved in the day-to-day operations or
11   does that all fall onto you now?
12     A.  He's going to be 92, up until two
13   years ago him and I worked side-by-side all
14   our life.
15     Q.  Okay.  So, for the last couple of
16   years you've been the sole decisionmaker and
17   operator of --
18     A.  Not necessarily.  He's still around,
19   he still comes to the farm, sometimes he runs
20   a tractor, but he told me three days ago his
21   farm up in Verdigre, he didn't think he could
22   handle it this year.
23     Q.  When did you first become aware of
24   the land sale from the debtors to their
25   children?

1          A.  Maybe last summer.

2          Q.  Okay.  And it's correct, I think, in

3     looking at the documents, there's no buy/sell

4     agreement for stockholders; is that correct?

5          A.  I haven't studied it, but I believe

6     you're correct.

7          Q.  Okay.  There's no restrictions on

8     the sale of stock?

9          A.  Not that I know of.

10         Q.  Okay.  And as I understand, Mr.

11    Hall, you are proud that your farming legacy

12    in the Hall family is almost at 100 years; is

13    that correct?

14         A.  That's correct.

15         Q.  And you are -- you want to make sure

16    that that Hall legacy and ownership of this

17    land continues?

18         A.  That's correct.

19         Q.  Okay.  And you're concerned that

20    Lisa Zuhlke's 11 percent, 11 and a half

21    percent or whatever it is, it's possibly going

22    to affect that legacy, aren't you?

23         A.  Yes.

24         Q.  Okay.  Because there's a potential

25    if something doesn't get solved here that

1    there may be another owner of that portion of

2    the family stock?

3         A.  Yes.

4         Q.  And that's something you want to

5    prevent?

6         A.  Up until I got rid of my legal

7    counsel that was true, now I don't really

8    care.

9         Q.  Okay.  Do you care if Sunshine Ranch

10   continues?

11        A.  Yes, I do.

12        Q.  Okay.  Do you recognize any risk

13   that Sunshine Ranch may not continue?

14        A.  Every day, and this compounded.  Do

15   you want to comment?  Go ahead.

16        Q.  Are you still willing to try to work

17   towards preserving Sunshine Ranch?

18        A.  Yes.

19        Q.  Okay.  So, the door is still open to

20   try to resolve some of these claims involving

21   Lisa's stock, would that be true?

22        A.  Yes.

23        Q.  All right.

24            MR. KELLY:  That's all the questions

25   I have for the moment.

1          MR. GARDEN:  I just have a couple of
2    follow-ups.
3                **EXAMINATION BY MR. GARDEN**
4          Q.  Mr. Hall, you mentioned the brother
5    was told that his stock in Sunshine was
6    worthless, who told him that?
7          A.  Worthless if he wanted to use it to
8    borrow money.
9          Q.  Okay.  Did you ever tell Lisa Zuhlke
10   that her stock in Sunshine was worthless?
11         A.  No.
12         Q.  Did you ever hear your father tell
13   Lisa Zuhlke that her stock in Sunshine was
14   worthless?
15         A.  No.
16         MR. GARDEN:  I have no further
17   questions.
18         MS. GOODMAN:  I have a few.
19               **EXAMINATION BY MS. GOODMAN**
20         Q.  Has Sunshine -- we just heard some
21   questions from Mr. Kelly with regard to the
22   legacy of Sunshine Ranch and your interest in
23   preserving that and preserving the ownership
24   structure.  Let me ask this, has Sunshine
25   Ranch considered selling its assets or a

1   portion of its assets in order to redeem Lisa

2   Zuhlke's 11 percent interest?

3          A.  No.

4          Q.  And is there some reason why not?

5          A.  It hasn't got to that drop-dead

6   point yet.

7          Q.  Okay.  Has Sunshine Ranch attempted

8   to obtain a loan to redeem Ms. Zuhlke's

9   11 percent interest?

10         A.  No.

11         Q.  Does Sunshine Ranch, in your

12  opinion, have the wherewithal to obtain a loan

13  in order to redeem Ms. Zuhlke's 11 percent

14  interest?

15         A.  Yes.

16         Q.  And is there some reason why

17  Sunshine Ranch hasn't gone down the avenue of

18  obtaining that loan?

19         A.  Yes.

20         Q.  What is it?

21         A.  The reason I applied for the loan on

22  my own is because we wouldn't have to have a

23  shareholders' meeting, we wouldn't have to

24  amend whatever the extra paperwork to possibly

25  have Sunshine Ranch buy it.  And then what

1   would Sunshine Ranch do with it, it's Sunshine

2   Ranch's 11 percent, what good is that?  Offer

3   it to all the kids that are still around, my

4   dad is 92, their prorated share?  What would

5   that prove?  That's why I applied for the loan

6   on my own.

7       Q.  Okay.

8       A.  I am not GM, I'm not Nucor, I'm not

9   publicly traded.

10      Q.  All right, sir, I've got a couple

11  more questions and then a more general

12  question about that box in the corner

13  (indicating).  If we could look at Exhibit 28.

14          MR. GARDNER:  It's this one

15  (indicating).

16      A.  Right here?

17          MR. GARDNER:  Yep.

18      Q.  (Ms. Goodman) Okay.  If we could

19  turn, sir, down to the page that's labeled

20  1050.

21      A.  (Witness so doing.)

22      Q.  All right.  I want to just ask you

23  about a few of these line items.  So, the

24  first one it says 'rent income', do you see

25  that line, it's got a number 389 by it?

1        A.  Yep.

2        Q.  All right.  In 2021/2022 timeframe

3   you show 143,000 roughly of rent income and

4   then that jumps to 1.1 million the next year

5   and then back down to around 117,000 the next

6   year.  Is there some -- what was the reason

7   for that fluctuation?

8        A.  I can't recall.

9        Q.  Okay.  Same similar question now

10  with regard to contract labor, it's expense

11  515.  We show 23,000 the first year, 32,000

12  the next year, but then we jump up in the

13  third year to 192,000; do you see that?

14       A.  Yep.

15       Q.  Was there something going on in

16  2023/2024 that resulted in the increase

17  contract labor expense?

18       A.  Might have had a hired man.  Might

19  have had some other stuff done, some type of

20  contract labor.

21       Q.  All right.  So, is your answer you

22  don't know sitting here today?

23       A.  I don't know right now, no.

24       Q.  Okay.  What about going down to 535,

25  fertilizer and chemical.  It looks like in one

1    year -- in the first year we've got 497,000

2    roughly of chemical expense, but then it goes

3    down to 41,000 the next year, and zero the

4    next year.  Can you explain the variation of

5    the year there?

6         A.  Sometimes you prepay, sometimes you

7    don't.

8         Q.  So is your testimony that there was

9    a prepaid expense that went out that year?

10        A.  It could have been.

11        Q.  All right.  And then going to the

12   next page, so now we're on 0150.

13        A.  That's where I was before, 0150.

14        Q.  I'm sorry, 0151.  All right.

15   Looking at 595 supplies or, I'm sorry, seed --

16   strike that.

17             585 seed, we've got 92,000 in the

18   first year, and then 722,000 the next year,

19   and then 364 the following year.  Is there

20   some reason why the seed cost fluctuates year

21   over year?

22        A.  Two reasons; number one, maybe

23   prepaid; number two, if you plant it all to

24   beans, the seed cost isn't as high as if you

25   plant it all to corn.

1          Q.  Okay.  And to be clear, the seed

2    cost here reflects only the seed that was

3    planted in Sunshine Ranch's land, correct?

4          A.  Oh, a couple of them got planted in

5    my shower when I took my boots off that night.

6    Yes, only in Sunshine Ranch.

7          Q.  All right.  I want to ask now, you

8    brought in a box of documents?

9          A.  Yep.

10         Q.  Can you just -- generally speaking,

11   what is that box of documents, what are those?

12         A.  It's everything that has been

13   printed off that is public knowledge to follow

14   this case.

15         Q.  Okay.  Is there any objection to us

16   just reviewing this?  We don't need to stay on

17   the record.

18         A.  Who is 'we'?

19         Q.  Me, can I look through it?

20         A.  No.  I didn't bring it down for you.

21         Q.  Okay.  Who did you bring it down

22   for?

23         A.  Myself, to prove that I've been

24   watching this thing and it's concerning to me.

25         Q.  Okay.

1          MS. GOODMAN:  Um, all right, if I

2     could have two minutes to chat with my folks

3     and then I think this should be pretty close.

4          MR. GARDEN:  Sure.

5          A.  Do we need to leave the room?

6          MR. GARDEN:  No, we've got Phil in

7     here, too.

8               (A short break was taken.)

9          Q.  (Ms. Goodman) All right.  Mr. Hall,

10    I've handed you Exhibit 25, which is a series

11    of pictures that you took, correct?

12         A.  Yep.

13         Q.  All right.  In here you've

14    identified two skid loaders; is that correct?

15         A.  Yep.

16         Q.  All right.  And with the skid

17    loaders come attachments?

18         A.  There's some beside it.

19         Q.  There's some beside it.  What

20    evidence do you have sitting here today that

21    these skid loaders belong to Lisa or Alden

22    Zuhlke?

23         A.  I have none.

24         Q.  Excellent.

25         MS. GOODMAN:  All right.  And I just

1    want to follow-up on -- Phil, you had some

2    questions with regards to meetings and I just

3    want to make sure that the record is

4    abundantly clear.

5         Q.  (Ms. Goodman) With regard to

6    Sunshine Ranch you -- have you ever attended a

7    shareholder meeting concerning Sunshine Ranch?

8         A.  Not that I know of.

9         Q.  Okay.  And, likewise, then, you have

10   no information that Lisa Zuhlke has ever

11   attended a shareholder meeting involving

12   Sunshine Ranch, correct?

13        A.  Correct.

14            MS. GOODMAN:  That's all I have.

15            MR. GARDEN:  I have nothing further.

16   Phil?

17            MR. KELLY:  No more questions from

18   me.

19        A.  I got one other comment, if I may?

20            MR. GARDEN:  Sure.

21            MS. GOODMAN:  Do we need it on the

22   record though?

23        A.  Yeah, you can put it on the record.

24   I have no evidence that those are theirs, or

25   Lisa and Al's, just like I said.

1          MS. GOODMAN:  Great.  Okay.

2          A.  But the dust was about this thick on

3    one of them (indicating).  It has been sitting

4    for a long time, it's probably on their

5    depreciation schedule, one of them.

6          MR. GARDEN:  When you said 'dust was

7    this thick', a half inch?

8          A.  It's not a half inch, but it's

9    thick.

10          MR. GARDEN:  Okay.  I am not your

11    lawyer.  Phil?

12          MR. KELLY:  Let the court reporter

13    do it.

14          MR. GARDEN:  Yes, about read and

15    sign.

16          COURT REPORTER:  Sir, you have the

17    right to read and sign the deposition.  And

18    what that means is that you can choose to read

19    and sign it or you can say I don't need to

20    read and sign it, I'm just going to waive it.

21    If you choose to read and sign it, I'll send

22    it to you in the mail with a signature page

23    and you have 30 days to return that.

24          A.  I waive.

25

1                    (Deposition was concluded at

2                  3:04 p.m.)

# **C E R T I F I C A T E**

1

2

3          I, Tracy S. Kaczor, Certified

4   Shorthand Reporter and General Notary Public

5   in and for the State of Nebraska, do hereby

6   certify that the witness in this matter was by

7   me duly sworn to testify the truth, the whole

8   truth, and nothing but the truth, and that the

9   deposition was reduced to writing by me or

10  under my direction;

11          That the within and foregoing

12  deposition was taken by me at the time and

13  place herein specified and in accordance with

14  the within stipulations; the reading and

15  signing of the witness to this deposition

16  having been waived;

17          That I am not counsel, attorney or

18  relative of either party of otherwise

19  interested in the event of this suit.

20          In testimony whereof, I have placed

21  my hand and notarial seal this  23rd  day of

22  _April_, 2025.

23

24  TRACY S. KACZOR, CSR
    POB 38
25  Ewing, NE  68735